(No. 60526

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT KUBAT, Appellant.

*Opinion filed October 17, 1986.—Rehearing denied December 1, 1986.*

426

SIMON, J., dissenting.

Daniel D. Yuhas, Deputy Defender, of the Office of the State Appellate Defender, of Springfield (Jonathan C. Haile and Jane Raley, Assistant Defenders, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks, Solicitor General, and Mark L. Rotert and David E. Bindi, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, defendant, Robert Kubat, was convicted of the aggravated kidnaping (Ill. Rev. Stat. 1979, ch. 38, par. 10—2) and murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) of Lydia Hyde. In a hearing requested by the People, the jury found that there existed one or more of the factors set forth in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)) and that there were no mitigating factors sufficient to preclude a sentence of death. Defendant was sentenced to death for murder and to an extended term of 30 years' imprisonment for aggravated kidnaping. On direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603), the convictions were affirmed (*People v. Kubat* (1983), 94 Ill. 2d 437 (hereinafter referred to as *Kubat I*)). A petition for rehearing in this court was denied, and

the Supreme Court denied defendant's petition for writ of *certiorari.* (*Kubat v. Illinois* (1983), 464 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199.) Defendant filed a petition under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1983, ch. 38, par. 122—1 *et seq.*), and the circuit court appointed counsel. The People's motion to dismiss the petition, as amended, was denied. Following an evidentiary hearing the circuit court denied defendant's amended petition for post-conviction relief, and defendant appealed. Upon allowance of the People's motion made pursuant to Rule 302(b) (103 Ill. 2d R. 302(b)), the appeal was transferred to this court. Because the opinion affirming defendant's convictions contains a comprehensive review of the evidence (94 Ill. 2d 437, 446-63), the facts will be stated here only to the extent necessary to discuss the issues.

The testimony at trial (*Kubat I*) showed that during the evening of November 1, 1979, accompanied by Carolyn Sue Quick, his former wife, defendant visited several bars in the Chicago area. After closing time, they traveled in defendant's station wagon to Kenosha, Wisconsin. During the early morning hours of November 2, 1979, defendant and Ms. Quick stopped at the Kickapoo gas station in Kenosha, where they parked and slept until the station opened. When they awoke, they continued to drive through Kenosha, stopping at several taverns, at each of which defendant consumed boilermakers (an Old Style beer and a shot of Canadian Club) while Ms. Quick drank coffee and grapefruit juice.

The last bar at which they stopped was the Coffee And bar, where Lydia Hyde was alone, bartending. Defendant sat at the bar directly in front of the cash register while Ms. Quick sat to his left. After Mrs. Hyde placed a money bag in the cash register, defendant went behind the bar, held a .38-caliber revolver to her back, and told her to put the money from the register in the

bag. She complied. Defendant told Mrs. Hyde that she was coming with them. Mrs. Hyde was taken to the car, where she sat in the front seat between Ms. Quick, who was driving, and defendant. At defendant's direction, Ms. Quick drove into Illinois. Defendant told her to stop, and she stopped the car next to a road sign. Defendant ordered Mrs. Hyde to leave the car and to hold the sign and face west. As she held her hands up to grasp the sign, defendant shot her in the back of the head. About three weeks later, Ms. Quick met with agents of the FBI and the Illinois Department of Law Enforcement and gave statements inculpating defendant and herself.

Defendant contends first that, in violation of the sixth amendment to the United States Constitution, he was denied the effective assistance of counsel at both the guilt and sentencing stages of his trial. Defendant argues that his counsel were ineffective in that they failed to call alibi witnesses who were available to testify on his behalf, failed to move to suppress illegally seized evidence, failed to thoroughly investigate the case, and failed to present important exculpatory evidence.

The People assert that this court, in defendant's direct appeal, considered and rejected the claim that defendant's counsel were incompetent and that the matter is *res judicata*. Defendant argues that the contentions made in this appeal are based upon evidence adduced at the post-conviction hearing, that they could not have been previously raised, and that the incompetence created such substantial prejudice that, absent the inadequate representation, the result of the trial would probably have been different. Defendant also charges that defense counsel failed to discover and present at the penalty hearing evidence in mitigation and failed to object to an erroneous instruction which advised the jury that a unanimous verdict was required in order to reject the death penalty.

The parties are in agreement that the question whether defendant received ineffective assistance of counsel must be determined under the standards enunciated in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. Although noting that application of the *Strickland* standards was unlikely to result in findings significantly different from those reached under the tests established by this court in *People v. Greer* (1980), 79 Ill. 2d 103, 120-21 (actual incompetence of retained counsel entitles defendant to a new trial if the incompetence created such substantial prejudice that the trial result probably would have been different), and *People v. Royse* (1983), 99 Ill. 2d 163, 170 (same standard applicable to appointed counsel), this court, in *People v. Albanese* (1984), 104 Ill. 2d 504, adopted the *Strickland* standards. In *People v. Lewis* (1984), 105 Ill. 2d 226, 245, the court noted its previous summarization of the *Strickland* standard in *People v. Mack* (1984), 105 Ill. 2d 103:

" 'As announced in *Strickland*, the test for effective assistance of counsel has two prongs:

"First, the defendant must show that counsel's performance was deficient [by] showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (466 U.S. [668, 687], 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.)

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. \*\*\*

Judicial scrutiny of counsel's performance must be highly deferential. \*\*\* [A] court must indulge a

strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (466 U.S. [668, 689], 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065.)

"When a defendant challenges a death sentence *** the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. [668, 695], 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2069.

In developing the reasonable-probability test, the court stated that it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding, because "[v]irtually every act or omission of counsel would meet that test ***." (466 U.S. [668, 693], 80 L. Ed. 2d 674, 697, 104 S. Ct. 2052, 2067.) On the other hand, the "defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case." (466 U.S. [668, 693], 80 L. Ed. 2d 674, 697, 104 S. Ct. 2052, 2068.) The appropriate standard of prejudice, the court stated, should be somewhat lower because "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." (466 U.S. [668, 694], 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) Thus the court settled on the reasonable-probability test and stated:

"The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (466 U.S. [668, 694], 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.)

The court further stated that "[a] reasonable probability is a probability sufficient to undermine confidence in the

outcome." 466 U.S. [668, 694], 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.' 105 Ill. 2d 103, 129-31." *People v. Lewis* (1984), 105 Ill. 2d 226, 245-46.

At the hearing on the post-conviction petition, Margie Elea testified that, had she been called at defendant's trial, she would have testified that in November 1979 she was the manager of a gasoline station located in Highland, Indiana; that in the late evening of November 1, 1979, defendant, accompanied by an unidentified woman, entered the gas station and told her that his car had broken down; that defendant was still at the station when she left at approximately 2 a.m. on November 2, 1979; and that defendant was driving a white station wagon. Francine Bejda testified that, if called at defendant's trial, she would have testified that she lived with defendant during the late months of 1979; that on the evening of November 1, 1979, she went to dinner with defendant; that they returned home and he left at about 7 or 8 p.m.; that she next saw defendant between 6 and 8 a.m. on November 2, 1979. She testified that they then drove to the Lyons Township General Assistance Office, where she picked up a rent-assistance check from her caseworker, Nancy Schultz. Ms. Schultz had testified at defendant's trial that she saw defendant through the window in the hall. Ms. Bejda testified that after picking up the check she and defendant went to the Star Lounge, also known as "Lil's Tavern," and while there spoke with Ms. Tesnohlidek and Charles Fleisig. At the time of the post-conviction hearing, Fleisig was deceased. The record indicates that prior to defendant's trial, he had been interviewed by defense counsel but efforts to find him and obtain his testimony at trial were unsuccessful. Sister Alberta Surico testified that on September 23, 1983, Fleisig executed an affidavit in her presence in which he stated that on November 2, 1979, at 11 a.m., he had seen defendant at the Star Lounge (Lil's Tavern). He stated

further that defendant was accompanied by Francine Bejda, and that although he was willing to testify at defendant's trial, he was not subpoenaed as a witness. Defendant alleges that the testimony of certain other alibi witnesses at defendant's original trial would have been bolstered by the testimony of Ms. Bejda.

Defendant contends that the failure to present the testimony of the foregoing alibi witnesses was "shocking and inexplicable." He argues that "no explanation is apparent" as to why defense counsel chose not to present these witnesses and that the failure "cannot be deemed to have been strategic."

Upon reviewing the testimony and applying *Strickland* standards, we are unable to say that counsel's assistance was unreasonable considering the circumstances. Both Ms. Elea and Ms. Bejda fixed the date of the occurrences concerning which they testified by methods which could reasonably lead counsel to conclude that cross-examination could severely damage their credibility. The failure to find a witness, *per se*, cannot constitute ineffective assistance of counsel, and nothing in the record suggests that failure to find Fleisig was the result of failure to investigate or incompetence of counsel.

Defense counsel might also reasonably have concluded that Ms. Bejda's testimony, viewed in the light of her relationship with defendant, might be harmful to his alibi defense. Counsel might have reasonably concluded that Ms. Elea's testimony concerning defendant's presence in Highland, Indiana, with an unidentified female hitchhiker, six hours before he was allegedly seen in Kenosha, Wisconsin, would be of questionable value. Although this would have contradicted Ms. Quick's testimony to the extent that Ms. Quick testified that she and defendant had visited several Chicago bars on the evening of November 1, 1979, and subsequently driven to Kenosha, it would not have proved an alibi for the crime committed

at about noon on November 2.

Defendant contends too that ineffective assistance of counsel is demonstrated by defense counsel's failure to object to the prosecutor's argument that a set of tires purchased by defendant on November 10, 1979, was placed on his automobile because the tires previously mounted on the automobile would have matched the plaster cast of a tire-track impression found at the scene of the crime. Defendant asserts that he had filed an insurance claim for the tires which he had replaced; that an adjuster for the Allstate Insurance Company had examined those tires; and that the adjuster would have testified that the tires were made by Uniroyal. The parties have stipulated that expert testimony would establish that the tire impression found at the scene of the crime was not made by a Uniroyal tire.

The People argue that the claims adjuster did not know if the tires on which defendant filed the claim were, in fact, on defendant's car on November 2, 1979. Thus, despite the stipulation that the tire track found at the crime scene was not made by a Uniroyal tire, it would still be necessary that defendant testify that Uniroyal tires were on his car on November 2, 1979. Defendant's testifying would have opened the door to the People's introduction, for the purpose of impeachment, of his lengthy criminal record (see *People v. Kubat* (1983), 94 Ill. 2d 437, 489-91). We are unable to say that the decision not to risk admission of this evidence was an unsound, strategic decision.

Defendant contends that counsel should have presented at trial the testimony of witnesses who testified at the post-conviction hearing that Ms. Quick's reputation in the community was bad. Defendant contends that because Ms. Quick was shown at trial to harbor extreme animosity toward defendant, the impeachment which did occur at trial "highlights rather than minimizes the im-

portance of the reputation testimony which could have been presented." He argues that only by knowing her propensity for dishonesty could the jury appreciate the significance of her animosity toward defendant. We fail to perceive how Ms. Quick's animosity would have highlighted rather than minimized the importance of the testimony concerning her bad reputation for honesty. In view of the strong impeachment evidence that was, in fact, elicited (*e.g.*, her animosity toward defendant, her threat to kill him, her testimony in exchange for immunity, the fact that she may have lied to annul her second marriage to defendant, and her attempt to have defendant arrested on a previous occasion), we conclude that defendant was not prejudiced by defense counsel's decision not to introduce the evidence of her reputation.

Defendant asserts that there should have been presented at his trial testimony that the getaway car was a grey Chevrolet Monte Carlo rather than a white station wagon. Dale Gonsky and Dorothy Hawley were present at the Coffee And bar at the time of the abduction. They testified at defendant's trial that at the time that it was discovered that Lydia Hyde was missing they observed a grey automobile drive rapidly out of the parking lot. Testimony at the post-conviction hearing showed that both witnesses had told the investigating police officers, and would have testified, that the vehicle which they saw leaving the parking lot may have been a Chevrolet Monte Carlo. Defendant argues that evidence that the vehicle used in the abduction might have been a Monte Carlo supports a theory that Ms. Quick's accomplice was someone other than defendant because neither of these witnesses could have mistaken a station wagon for a two-door Chevrolet Monte Carlo. Although it might have been preferable for defense counsel to have elicited the fact that the car which these witnesses saw "might" have been a Monte Carlo, nonetheless, their testimony is

not necessarily inconsistent with Ms. Quick's testimony that defendant was driving a white Chevrolet station wagon. The jury could reasonably have concluded that because these witnesses observed the vehicle for only the brief period when it was leaving the parking lot, they could have mistaken a station wagon for a Monte Carlo.

Defendant contends next that further evidence of counsel's incompetence is their failure to move to suppress evidence seized in an allegedly unlawful search of his automobile and their failure to tender an instruction on unlawful restraint, as a lesser included offense. Although the question concerning the search of the automobile may be deemed waived by reason of failure to raise it on direct appeal (*People v. Gaines* (1984), 105 Ill. 2d 79, 88), we note that the record does not support defendant's contentions. The complaint for a warrant to search defendant's automobile shows ample probable cause. Some of the evidence seized was in plain view of the police officer whose affidavit is the basis of the complaint, and the search was not made until the search warrant was issued. The failure to tender an instruction on the offense of unlawful restraint was considered in *Kubat I* (94 Ill. 2d 437, 485-87). This court has consistently held that " ' "where a person convicted of a crime has taken an appeal from the judgment of conviction on a complete record, the judgment of the reviewing court is *res judicata* as to all issues actually decided by the court ***." ' [Citations.]" (*People v. Lewis* (1984), 105 Ill. 2d 226, 250-51.) Concerning these contentions we hold that the record fails to show that a motion to suppress would have been allowed and the issue concerning the instruction is *res judicata*.

We consider next defendant's contentions concerning his failure to receive effective assistance of counsel at the sentencing phase of his trial. He argues that counsel were ineffective because they failed to investigate or dis-

cover the evidence in mitigation which could have been presented on defendant's behalf. In support of this contention he cites the testimony of 15 of the witnesses who testified concerning defendant's good character. They stated that they were available and willing to testify at defendant's trial but heard nothing from defendant's counsel. Defendant asserts that counsel were "unaware of the evidence which was available to be presented on Mr. Kubat's behalf" and argues that "it would be ridiculous to suppose that" counsel made a strategic decision not to present the testimony.

Defendant testified at the post-conviction hearing that he had told counsel about these witnesses, but the record does not show whether counsel interviewed them. In *Kubat I*, the court noted that the failure to offer evidence in mitigation does not necessarily demonstrate incompetence and that the reason no evidence in mitigation was presented might have been because there was nothing sufficiently mitigating in the circumstances surrounding the crime or defendant's background that could have been presented. (94 Ill. 2d 437, 488.) After briefly reviewing defendant's record of "violent criminality" from age 21 to his release from the Florida State Penitentiary in 1963, the court said:

"In 1965, defendant again proceeded to commit a series of armed robberies, this time in Cook County. On March 17, he robbed a cashier and pharmacist at gunpoint at a drug store and as he fled fired a shot at a customer who was writing his license plate number. On March 22, he returned to the same drug store and at knife point robbed another cashier and the pharmacist's wife. On April 12, he committed yet another armed robbery at gunpoint at a pharmacy, and finally on April 14, he committed a final armed robbery with a gun at another store. He pleaded guilty to each charge and was sentenced to four concurrent four- to seven-year terms.

Defendant was released from the Illinois State Peni-

tentiary at Joliet in January 1970. He was arrested in June and charged with unlawful use of a weapon. He pleaded guilty, served eight months in jail, and received five years' probation. He was released in February 1971.

In September 1972, defendant and a companion committed an armed robbery at a dry cleaner in Berwyn. Defendant pleaded guilty to armed robbery and was sentenced to two concurrent terms of four years to four years and one day for the robbery and a violation of probation. He was paroled in 1976 from the Illinois State Penitentiary pursuant to a mandatory statutory release date, although the parole board panel concluded that he was not a good risk for parole. Since the order was mandatory, the board recommended very close supervision. Defendant was arrested later that year on a charge of unlawful use of a weapon but later found not to be a violator. His parole was continued." 94 Ill. 2d 437, 489-90.

The testimony of the character witnesses shows that, with three exceptions, they had known defendant only since 1976, approximately three years before the kidnaping and murder. We are unable to say that the decision to forgo the character testimony in face of defendant's record, was, under the circumstances, unreasonable or that it indicates ineffective assistance of counsel.

Defendant contends further that the assistance of counsel was ineffective at the sentencing phase of trial in that counsel failed to object to the jury instructions given at the close of the second stage of the sentencing hearing; and that his closing argument at the sentencing hearing was ineffective and prejudicial. The first issue was raised and decided in *Kubat I* (94 Ill. 2d 437, 492), and therefore the doctrine of *res judicata* applies. (*People v. Lewis* (1984), 105 Ill. 2d 226, 250-51.) The second issue could have been raised on direct appeal and, therefore, is deemed waived. *People v. Gaines* (1984), 105 Ill. 2d 79, 88.

We consider next defendant's contention that he was

denied the right to conduct his own defense because counsel failed to discuss with him whether he should testify on his own behalf, whether he should waive a jury for sentencing, and whether he should submit jury instructions on unlawful restraint. Citing *Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525, he argues that because he suffers the consequences of an unsuccessful defense, he should have been permitted to make the fundamental decisions concerning the course of the proceedings. Citing *People v. Williams* (1983), 97 Ill. 2d 252, the People argue that defendant has no right to both self-representation and the assistance of counsel; that acceptance of defendant's position would permit him to assert his right to counsel, and if the judgment is unsatisfactory, would permit him to plead his right to defend himself. We are of the opinion that defendant did not waive his right to counsel and that his right of self-representation was, therefore, waived.

Defendant contends that the exclusion of jurors opposed to the death penalty resulted in a jury biased in favor of the People. Defendant contends that 10 prospective jurors were excused for cause because of their opposition to the death penalty and that he was thus denied the right to a jury drawn from a fair cross-section of the community.

A *Witherspoon* issue (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770) was raised and decided in *Kubat I* (94 Ill. 2d 437, 498-99). The attack here is on a broader front. Defendant cites the symposium published in Law and Human Behavior, June 1984 (*Death-Qualification*, 8 Law and Hum. Behav. 1 (June 1984)) and the testimony at defendant's post-conviction hearing of Hans Zeisel, professor *emeritus* of law and sociology at the University of Chicago. Based on this information defendant argues that the rejection of jurors who were opposed to the death penalty resulted in a jury

biased in favor of the prosecution.

In *Lockhart v. McCree* (1986), 476 U.S. 169, 90 L. Ed. 2d 137, 106 S. Ct. 1758, the Supreme Court rejected an attack on the qualification of jurors under *Witherspoon* principles. (See also *Wainwright v. Witt* (1985), 469 U.S. 412, 83 L. Ed. 2d 841, 105 S. Ct. 844.) On this record defendant has not proved violation of his right to trial by an impartial jury as guaranteed by the sixth amendment to the United States Constitution.

For the reasons stated, we hold that the record, viewed in the light of the *Strickland* standards, fails to show ineffective assistance of counsel. The circuit court did not err in denying defendant's petition for post-conviction relief, and its judgment is affirmed. The clerk of this court is directed to enter an order fixing Wednesday, January 14, 1987, as the date on which the sentence of death entered in the circuit court shall be carried out at the Stateville Correctional Center at Joliet. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be furnished by the clerk of this court to the Director of Corrections and the wardens of the State correctional centers at Menard and Joliet. The judgment of the circuit court of Lake County is affirmed.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

I cannot agree that this defendant received effective assistance of counsel at his trial and subsequent sentencing. According to the majority, defense counsel acted upon a reasonable strategy during the guilt phase of defendant's trial in: (i) not calling two disinterested eyewitnesses who would have directly contradicted the testimony of the State's primary witness, Carolyn Sue Quick,

regarding the defendant's whereabouts on the evening of November 1, 1979, and the following morning when the murder occurred; (ii) not calling a third alibi witness even though the prosecution had been told the witness would testify and even though the prosecution was allowed to argue an inference to the jury that the witness did not testify because she would not have supported the defendant's alibi; (iii) not investigating the circumstances surrounding defendant's purchase of new tires, even though such investigation would have disproved the State's contention that the purchase showed consciousness of guilt, and even though the investigation would have further discredited Quick's testimony by contradicting her assertion that the old tires were in good condition when in fact they were slashed; (iv) not presenting any testimony regarding Quick's reputation for honesty, even though 12 witnesses were willing and able to testify at defendant's trial that it was dismal; and (v) not eliciting on cross-examination of two prosecution witnesses that the car they saw rapidly departing the parking lot at the Coffee And tavern was a two-door Chevrolet Monte Carlo and not a station wagon as the defendant was supposed to have driven. The majority explains these shocking deficiencies variously as reasonable decisions and sound strategy, but I question whether any criminal or civil litigants would want to be so soundly and reasonably represented as was the defendant in this case.

Regarding the failure to call Margie Elea, a disinterested witness who claimed to see the defendant in Highland, Indiana, at the same time Quick testified the defendant was with her in Chicago, the majority finds the decision reasonable because "cross-examination could severely damage [Elea's] credibility" and because her testimony was "of questionable value." (114 Ill. 2d at 433.) Contrary to what the majority states, Elea testified at defendant's post-conviction hearing that she was cer-

tain of the date she saw the defendant because it was on the day she took inventory at her gas station, the first of the month. She was at the station with the defendant for about four hours, and she observed that he was driving a white station wagon. Elea's testimony would have been of tremendous value for it rebutted the star prosecution witness, a woman having both animosity toward the defendant and a motive to fabricate her testimony. Counsel's additional omission in securing Charles Fleisig's testimony is not a matter of counsel's failure to find a witness, as the majority phrases it. (114 Ill. 2d at 433.) Counsel knew that Fleisig was a witness, but only attempted to subpoena him the night before the last day of trial. Fleisig could not be found that evening, and counsel's belated effort kept the jury from hearing the testimony of a disinterested witness who would have placed the defendant in Chicago at the time he was allegedly with Carolyn Sue Quick in Kenosha, Wisconsin.

Prudence is evident, says the majority, in counsel's decision not to call defendant's girlfriend, Francine Bejda, to testify in his behalf; the majority suggests that Bejda's testimony might have been harmful to the defendant because of her relationship with him. (114 Ill. 2d at 433.) Whether the jury would have attached any credibility to the alibi testimony of the defendant's girlfriend is, of course, open to question, but it is difficult to see how her testimony in support of the defendant's alibi could affirmatively harm his defense. Even if counsel thought that her testimony discounted by her prejudice might not have been helpful, is it not the height of negligence to give prosecutors a powerful rhetorical tool: that Bejda was not put on the stand because she would not support the defendant's alibi? As evidenced by her testimony at the post-conviction hearing, she would have buttressed the alibi, and the failure to present her testimony—a failure which allowed the prosecutor to argue

that Bejda "could not take the witness stand and under oath testify *** to this set of facts"—was inexcusable.

At trial the State made an issue of the defendant's purchase of new car tires eight days after the crime. Claiming that the defendant purchased those tires out of fear that he might have left an identifiable tire print at the scene of Lydia Hyde's murder, prosecutors said that the purchase established consciousness of guilt. That argument was supported by Quick's testimony that the old tires were in good condition when the new ones were bought. At the post-conviction hearing, however, an insurance claims adjuster (who had not been contacted by defense counsel in preparation for defendant's trial) testified that he examined the old tires and that they were slashed. He further testified that the old tires had been manufactured by Uniroyal; the State has stipulated that the tire tracks found alongside Lydia Hyde's body were not left by Uniroyal tires. Nonetheless, the majority has decided that counsel's failure to even investigate this matter was not outside the range of reasonable professional assistance, but in coming to that conclusion the majority has confounded the issue actually presented to the jury.

According to the majority, the defendant would have had to testify that the slashed tires which he replaced had been on his station wagon the day of the crime in order to nullify the State's argument. But the issue framed by the State was not whether the disposed-of tires actually made the tracks and had been on the defendant's car on November 2; rather, the question that the State argued to the jury was why the defendant would dispose of tires in good condition and buy new ones except to cover up his criminal involvement. Merely by proving that the tires were not in good condition and that they did not match the tracks found by police, the defendant would have demolished the State's theory that

the tire episode established consciousness of guilt. In so doing, Quick's credibility would again have been challenged by a witness without any interest in the case.

Furthermore, the State never suggested during defendant's trial that the tires which he replaced eight days after the crime had been on any car other than the defendant's station wagon. To the contrary, the State argued: "Ladies and Gentlemen, Robert Kubat deep-sixed those tires *that were on his car on November 2d.*" If counsel's failure on this issue can be deemed a reasonable trial strategy, it is difficult to understand what sort of legal assistance would be considered ineffective.

No more explicable is counsel's failure to present before the jury discrepancies between Quick's testimony and the accounts of two more disinterested witnesses. Quick claimed that the defendant abducted Lydia Hyde in the defendant's white station wagon. Two witnesses testified for the State that they saw a grey car speed away from the Coffee And tavern where Lydia Hyde was abducted. Defense counsel failed to elicit on cross-examination that both of those witnesses saw a two-door Chevrolet Monte Carlo, and not a station wagon, the car which the defendant owned and Quick described. The majority implies that counsel's failure in this regard was not outside the range of reasonable professional assistance. While acknowledging that it "might" have been "preferable" for counsel to have elicited this information (114 Ill. 2d at 435-36), the majority seems to say that counsel is competent and effective even if the jury is never apprised of basic contradictions in the stories of State witnesses.

More incredibly, the majority also says that if counsel was ineffective in not bringing the getaway-car contradiction to light, such incompetence did not prejudice the defense because a jury might believe that the witnesses "could have mistaken a station wagon for a Monte Carlo." (114 Ill. 2d at 436.) A jury might, I suppose, be-

lieve almost anything. But to speculate that the jury might believe that two separate witnesses lack the cognitive ability to differentiate coupes from station wagons does not persuade me. Groundless speculation is susceptible to endless manipulation in support of any proposition, and such pliable reasoning is not reason at all.

The State itself has conceded in its response to the defendant's direct appeal that the issue of defendant's guilt was very close and that defendant's innocence was "arguably established." In its original brief to this court in that appeal, the State admitted: "It was conceivable that on November 2, 1979, the defendant was not with Ms. Quick, but rather was in the company of Francine Bejda." Notwithstanding that concession and the fact that Quick's credibility was the issue around which defendant's trial revolved, the majority has concluded that the defendant was not prejudiced by counsel's ineffective assistance in failing to call a single witness to testify as to Quick's supposedly poor reputation for honesty in the community. (114 Ill. 2d at 436.) In examining the failure to present any reputation evidence—although 12 reputation witnesses were available, two of whom testified for the defense on other matters—the court should consider the extent to which counsel otherwise used available evidence to discredit Quick's story. Counsel sought to use Joy Jesuit's testimony to discredit Quick by proving that Quick had committed perjury in order to have her marriage annulled, but defendant's attorneys were unable to lay a proper foundation upon which to admit evidence of Quick's perjury and prior inconsistent statements (*Kubat I*, 94 Ill. 2d 437, 496). That inability to operate within the rules of evidence to the elementary extent necessary to lay a foundation for the admission of prior inconsistent statements, coupled with the failure to present any of the available reputation evidence, severely blunted the defendant's counterattack on Quick's

vulnerable credibility. Given that as the trial actually occurred the defense was able to establish a "conceivable" alibi, specific and reliable evidence of Quick's perjurous past and attacking her reputation for honesty could very possibly have changed the outcome of defendant's trial.

On direct appeal this court rejected the defendant's claim that he was denied the effective assistance of counsel at the penalty phase of trial even though his attorney failed to call any witnesses in mitigation. The court relied on the supposition that "there was nothing sufficiently mitigating in the circumstances surrounding the crime, defendant's background or otherwise, that could have been presented." (94 Ill. 2d 437, 489.) The evidence subsequently elicited at the post-conviction hearing, however, has proved this assumption incorrect.

At the hearing on the post-conviction petition, 15 witnesses testified as to positive aspects of Kubat's character and said that they had been available to testify at the penalty phase of the trial but were not asked to do so by defense counsel. The testimony of these character witnesses—co-workers, neighbors and friends, none of whom was related to the defendant—would have brought to the jury's attention that some people had found him generous, a good husband and father, kind to his neighbors, a good worker, a faithful friend, honest, and dependable. These are clearly relevant facts in mitigation.

The majority implies that perhaps counsel made a strategic decision not to call any witnesses in mitigation "in face of" the evidence of the defendant's criminal background. (114 Ill. 2d at 438.) Such a "strategic decision" demonstrates to my satisfaction that the defendant did not receive effective assistance of counsel. Although a sentencing jury may consider mercy (*People v. Holman* (1984), 103 Ill. 2d 133, 170) or any mitigating facts drawn from the evidence at the trial, a defendant will stand little chance of avoiding the death penalty if no

mitigating evidence at all is presented at the sentencing hearing. It can hardly be difficult for a jury to find there are "no mitigating factors sufficient to preclude the imposition of the death sentence" (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(g)) where the silence of the defense leads the jurors to believe no such factors exist.

The supposed strategic judgment, which the majority is "unable to say [was] *** unreasonable" (114 Ill. 2d at 438), has as its foundation the novel theory that the stronger the opponent's case, the less counsel should do in trying to rebut it. That argument carries its own refutation. The defendant was fighting for his life, but the jury never heard one word from anyone with something favorable to say about his character, although we now know that such people existed. The jury's determination was necessarily a discretionary one, and the defendant could only have been helped by this evidence.

In any event, there is no basis in this record for regarding the failure to call any witnesses in mitigation as a strategic decision. The majority's assertion that "the record does not show whether counsel interviewed" the potential character witnesses (114 Ill. 2d at 436-37) is inaccurate. In fact, the record discloses that all but two of those 15 witnesses were never contacted by defense counsel (the other two testified on unrelated issues at the guilt phase). Counsel were ignorant of the available mitigating evidence apparently because they never looked for it, and it cannot be seriously contended that defendant's attorneys made a reasonable strategic decision not to present evidence of which they were unaware. "A total abdication of duty should never be viewed as permissible trial strategy" (*Pickens v. Lockhart* (8th Cir. 1983), 714 F.2d 1455, 1467 (finding ineffective assistance where defense counsel failed to make any investigation of possible evidence in mitigation)), but that is precisely what this court has done.

In addition to the failure of defendant's attorney to present any mitigating evidence (only one of defendant's two attorneys bothered to make an appearance at defendant's death sentence hearing), counsel's closing argument at the second stage of the sentencing hearing, which covers only three pages of the record, was largely unintelligible and actually prejudicial to his client. The majority refuses to consider this claim of ineffective assistance, saying the "issue could have been raised on direct appeal and, therefore, is deemed waived." (114 Ill. 2d at 438.) Contrary to the majority's conclusion, this issue was fully argued by the defendant in his original, direct appeal to this court. On pages 90 and 91 of defendant's brief and argument, filed with this court October 5, 1981, he argued:

> "The failure to offer evidence in mitigation at the death penalty hearing was aggravated by defense counsel's closing argument. When asked by the court how much time he needed for closing argument, Public Defender Pease replied:
>
>> It's all been said. I don't have to say anything more than three to five minutes. It's all been said. (R. 1702)
>
> Thereafter, attorney Pease delivered a curt argument to the jury which is contained in three pages of the appellate record. (R. 1709-1711) The closing argument, which may best be described as nonsensical, concluded as follows:
>
>> In talking about guides, approaches, the ways that you may think, I am not going to convince you. I think these are attitudes you form long before, certainly many years before coming to the Lake County Courthouse, but you may, while you deliberate, weigh them all again and *decide the way you feel, Robert Kubat or Lydia Hyde*." (Emphasis in original.)

Both here and in the court's opinion on defendant's direct appeal, the court has failed to deal with the contention that asking the jury to choose between the defend-

ant and the victim is an ineffective plea for the defendant's life. The State has previously characterized that closing argument as "an insight into human behavior." My characterization is not so kind.

To the extent that counsel's remarks can be comprehended, he appears to have told the jury to measure the value of defendant's life against that of Lydia Hyde, the innocent victim, and decide who they "felt" for more. Given that advice by counsel for the defense, it is not surprising that the jury preferred Lydia Hyde and sentenced Kubat to death. What is surprising is this court's reticence to recognize and correct an egregiously unfair proceeding in which this defendant was sentenced to death with legal assistance that would border on the comical if only it were make believe.

Some 20 instances of ineffective assistance of counsel have been identified by the defendant, many of which are substantial. The defendant, in my view, has satisfied both prongs of the standard for demonstrating ineffective assistance of counsel set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. Counsel's performance was patently deficient, and there is a reasonable probability that the defendant would have been acquitted had his alibi defense been properly developed and Quick impeached with all the evidence at hand. It is also likely that the jury would not have sentenced him to death had it been exposed to the testimony of at least some of the 15 character witnesses and had counsel avoided a closing argument prejudicial to his client. Justice does not permit the execution of a defendant who was effectively rendered no legal assistance at all, and I must emphatically dissent.