2020 IL App (1st) 163292-U

FIRST DISTRICT
SECOND DIVISION
April 7, 2020

No. 1-16-3292

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 13 CR 3179-01 |
| | ) | |
| JOSE PENALOZA, | ) | Honorable |
| | ) | Nicholas Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justice Lavin and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    Following a jury trial, defendant Jose Penaloza (Jose) was convicted of aggravated discharge of a firearm (720 ILCS 5/8-4(A)) (West 2012) and the attempt murders (720 ILCS 5/24-1.2(a)(4) (West 2012) of Officers Richard Yi and Panos Theodorides. Jose's convictions stem from an incident that occurred on January 9, 2013 after he and codefendants Diego Penaloza (Diego), Marco Penaloza (Marco), and Rogelio Marin (Rogelio) were involved in a police chase during which Jose allegedly shot a firearm at the officers. Diego and Marco were similarly charged and tried simultaneously with Jose, and Rogelio pled guilty to the charge of unlawful use of a weapon by a felon. Jose was sentenced to concurrent terms of 36 years' imprisonment for the attempt murders and aggravated discharge of a firearm. He appeals his convictions, arguing that he was

deprived of his constitutional right to the effective assistance of counsel. Diego and Marco appealed separately. For the reasons discussed herein, we affirm.

¶ 2                                              Motion *in Limine*

¶ 3          Jose was represented in these proceedings by attorney Wayne Adams (Mr. Adams) and his associate, Hristina Barganska (Ms. Barganska). Prior to trial, the State and the defense both presented motions *in limine* regarding admission of gang evidence. The prosecution made an offer of proof that two witnesses saw the defendants flashing gang signs immediately prior to the shooting. The defense argued that the evidence was "too prejudicial." The court granted the State's motion to allow evidence of gang signing.

¶ 4                                              Trial

¶ 5          Officers Yi and Theodorides were on patrol in an unmarked squad car "in high gang activity areas" the evening of January 9, 2013. Officer Yi testified that they were stopped in the northbound lane of Laramie Avenue, near the intersection of North and Laramie, when they observed a beige SUV collide with a smaller black vehicle at the intersection. When the SUV failed to stop, the officers activated their lights and sirens and began chasing the vehicle.

¶ 6          The SUV ran a stop sign and a red light before turning left onto Hirsch Street. As the officers followed behind onto Hirsch, they could see the rear and passenger side of the vehicle. Officer Yi observed a "male Hispanic on the front passenger side stick his head out . . . look in [their] direction . . . [place] his right hand out with a large firearm and take one shot at [them]." The shooter had long hair and a tattoo on his right cheek. Officer Yi immediately called in "shots fired at the police" to the dispatcher. The SUV kept fleeing "turning northbound on Leamington . . . hopping the curb and ended up driving on the sidewalk next to [a] school." The vehicle continued northbound to the end of the block where it was stopped by another police vehicle between Hirsch and Le Moyne. The occupants of the SUV were immediately taken into custody.

¶ 7        At trial, Officer Yi identified Jose as the man "who pulled out a firearm and took a shot at [him] and [his] partner." A submachine gun and a loaded, detached magazine were recovered "at right about the point where [they] were shot at." Officer Theodorides likewise identified Jose as "the person he immediately [identified] as the shooter to the other officers on the scene." Officer Theodorides testified that the gun appeared to have jammed, because a round had been loaded backwards and "the gun would have depleted the magazine . . . all the way" if it had been functioning properly.

¶ 8        Evidence technician Officer Lisa Decker described the gun as a "9-millimeter high capacity weapon" from which multiple rounds could be fired. There was a "jammed metal fragment or metal casing inside the weapon" and the top bullet in the magazine had been loaded backwards. Other than those in the magazine, no bullets were recovered at the scene.

¶ 9        Officer Sergio Valdez testified that he was on patrol when "[a]n officer came over the radio requesting assistance. He had been shot at." When he arrived at the scene, Officer Valdez was directed to 5155 Hirsch Street because "Officer Yi had indicated that there was a weapon used in the crime." On the south side of Hirsch, Officer Valdez observed what "appeared to be a Mac-10" and a detached magazine on the ground. He noticed that the slide of the weapon was "locked to the rear and protruding [was] a brass casing." Officer Valdez made sure no one touched the weapon until the evidence technician arrived. On cross-examination by Ms. Barganska, Officer Valdez acknowledged that he did not observe the shooting and heard "that [officers] were being shot at and they needed assistance" over the radio.

¶ 10       Officer Jose De Leon was part of the tactical unit that responded to the scene after receiving "notice that police were shot at [or] near that location." Officer De Leon made an in court identification of Diego, not Jose, as the man he saw seated in the front passenger seat when he approached the vehicle; however, when shown a photograph of Jose later in his testimony, he

identified Jose as the man he pulled from the front passenger seat. He recovered a glove from between Jose's legs and a plastic bag containing 11 live 9-millimeter rounds of ammunition from his jacket pocket.

¶ 11    The defense called Illinois State Police Forensic Scientist Mary Wong to testify regarding gunshot residue (GSR). At a sidebar, the State objected on grounds that the defense had failed to lay a proper foundation for Ms. Wong's testimony. The trial judge admonished Mr. Adams for being unprepared but urged the State "to stipulate to chain of custody" so that the witness could testify. In response to the judge's inquiry, Mr. Adams incorrectly indicated that no one in the vehicle had tested positive for GSR. The State clarified that Diego had tested positive, but that they were only willing to stipulate for purposes of Jose's GSR test results. An off the record discussion was subsequently conducted in the judge's chambers. When the trial resumed, Ms. Barganska took over Ms. Wong's examination. The record does not reveal why Ms. Barganska completed the examination begun by Mr. Adams.

¶ 12    Ms. Wong testified that no GSR was recovered from Jose's hands or the front passenger seat of the SUV. This indicated that Jose "may not have discharged a firearm with either hand. If he did, then the particles were either removed by activity or not deposited or not detected by the procedure." On cross-examination, Ms. Wong testified that Jose's hands were tested approximately four hours after his arrest, and that it is possible to remove GSR in various ways including touching another surface or washing your hands. She also stated that the circumstances surrounding the discharge of the firearm (e.g. whether it was discharged outside of a car or in a moving environment) could affect whether GSR is deposited. Finally, she confirmed that wearing a glove would prevent the deposit of gunshot residue particles.

¶ 13    Next, the defense called Rogelio Marin to the stand. Rogelio was dating Jose's sister and living with the Penaloza family in January 2013. On the evening of January 9, 2013, he and the

Penaloza brothers were driving around when they encountered some African American men in a black car. Rogelio used to be a gang member, and everyone started "[throwing] gang signs" at each other. At some point, Rogelio, Jose, and Diego exited their vehicle and Rogelio exchanged gang signs with the African American men, who had also exited their vehicle. Rogelio had a submachine gun in his belt but did not display it to the occupants of the other vehicle. During the chase that subsequently ensued, Marco was driving, Jose was in the front passenger seat and Rogelio was in the rear passenger seat behind Jose. Marco "couldn't brake so [they] got into a car accident." Marco kept driving. When Rogelio saw police lights behind them, he threw the gun out the car window. Rogelio saw a flash and heard the gun going off as it hit the side of the curb.

¶ 14     On cross-examination, Rogelio admitted that he pled guilty to possession of a firearm by a felon in connection with this case and that he had previously been convicted of "unlawful use of a weapon by a gang member." He verified that he was a member of the Latin Styler street gang and that he brought a "gang gun" into the SUV on the night in question. Rogelio admitted that he had gang tattoos and willingly demonstrated his gang sign for the jury. On redirect, Ms. Barganska asked Rogelio to "explain a little bit about what [the Latin Styler] gang does. Is it a violent gang . . .[?]" Rogelio testified that "[i]t's a small gang" and that "you can't really say it's known for a lot of violence. Mainly would be more about selling drugs" and "get[ting] money, mak[ing] money."

¶ 15     Finally, Jose testified that he and his brothers were on their way to "get some beers," when they encountered the African American men in the black car. Jose and Rogelio got out of the SUV, Rogelio exchanged gang signs with the men, and the men drove off. Jose saw a gun "tucked in [Rogelio's] belt" during this exchange. When they got back in the car, Marco was driving, Jose was in the front passenger seat, Rogelio was seated behind Jose, and Diego was seated behind Marco. As they reached the corner of Laramie and North Avenue, Marco "accidentally hit another car" and kept driving. At this point, Jose saw an unmarked squad car activate its lights and begin

chasing them. As Marco turned left on Hirsch, Jose saw Rogelio toss the gun out the window. Jose heard a noise and thought the police were shooting at them.

¶ 16    The SUV was stopped by a tactical team on Leamington. Jose testified that the officers approached his door and "were saying I'm the shooter." As Officer Yi pulled him out of the car, Jose stated, "I didn't shoot nobody. I got nothing to do with this. None of us did no shooting." The trial judge interjected that "[t]his is all hearsay, if anybody wants to make an objection" and sustained the State's belated objection.

¶ 17    The jury convicted Jose of the attempt murders of Officers Yi and Theodorides and of aggravated discharge of a firearm in the direction of the officers. Jose filed a motion for a new trial, asserting trial court error and ineffective assistance of counsel. After hearing testimony from Mr. Adams, Ms. Barganska, and Jose, the court denied the motion. The judge sentenced Jose to concurrent terms of 36 years' imprisonment for the attempt murders and aggravated discharge of a firearm. Jose timely appealed.

¶ 18                                                ANALYSIS

¶ 19    A denial of a motion for new trial will not be disturbed on review absent a showing that the trial court abused its discretion. *People v. Jophlin*, 2018 IL App (4th) 150802. An abuse of discretion will be found where the trial court's ruling is arbitrary, or no reasonable person would take the view adopted by the trial court. *Id.* On appeal, Jose asserts that the denial of his posttrial motion was error and that he was deprived of his constitutional right to effective assistance of counsel at trial. Specifically, he argues that Ms. Barganska elicited highly prejudicial gang evidence during Rogelio's direct examination; failed to object when the State cross-examined Rogelio about his gang affiliation; failed to object to hearsay testimony regarding police dispatches and made improper statements during her closing argument. Mr. Adams allegedly failed to

investigate and/or introduce exculpatory evidence that Diego tested positive for GSR and behaved erratically and unprofessionally throughout the trial.

¶ 20      Both the United States and Illinois Constitutions guarantee a criminal defendant the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1907, art. I, § 8; *People v. Hale*, 2013 IL 113140, ¶ 15. We review a defendant's claim that his constitutional rights were violated *de novo*. *People v. Burns*, 209 Ill. 2d 551, 560 (2004). To prevail on an ineffective assistance claim, a defendant must prove that 1) his lawyer's representation fell below an objective standard of reasonableness, and 2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 692 (1984). To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Id.*at 694. A "reasonable probability" is "defined as a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair." *People v. Patterson*, 2014 IL 115102 ¶ 81, citing *People v. Evans*, 209 Ill. 2d 194, 220 (2004). A defendant's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim. *People v. Morgan*, 187 Ill. 2d 500, 529-30 (1999).

¶ 21      In assessing the first prong, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 689; *People v. Jordan*, 247 Ill. App. 3d 75, 82 (1993). "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102 ¶ 81. "The objective of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

¶ 22                                    Gang Evidence

¶ 23        Defendant argues that Ms. Barganska improperly elicited gang evidence at trial, despite

co-counsel's motion *in limine* to exclude such evidence. Initially, the contested evidence pertained

to Rogelio's gang affiliation, not Jose's. Rogelio testified that he used to be in the Latin Styler

gang, so he and the African American men in the black car began "[throwing] gang signs" at each

other. He admitted that he was the one who brought a gang owned gun into the vehicle and threw

it out the window during the police chase. He was adamant that Jose had "nothing at all" to do

with the gun and acknowledged that he pled guilty to possessing it. Jose corroborated that Rogelio

had flashed gang signs and "toss[ed] the weapon out [of the vehicle]" during the police chase.

¶ 24        It is well established that decisions regarding "what matters to object to and when to object"

are matters of trial strategy. *People v. Perry*, 224 Ill. 2d 312, 344 (2007). Whether to call particular

witnesses is also a matter of trial strategy and thus will not ordinarily support an ineffective

assistance of counsel claim. *People v. Patterson*, 217 Ill. 2d 407, 442 (2005). A reviewing court

shall be highly deferential to trial counsel on matters of trial strategy, making every effort to

evaluate counsel's performance from his perspective at the time, rather than through the lens of

hindsight. *Perry*, 224 Ill. 2d at 344.

¶ 25        The defense theory in this case was that the gun accidentally discharged when Rogelio

threw it out of a moving vehicle. It is reasonable to conclude that defense counsel, as a matter of

trial strategy, chose to emphasize Rogelio's gang affiliation in order to convince the jury that

Rogelio, not Jose, was in possession of the "gang gun" involved in this incident. "[T]he fact that

another attorney might have pursued a different strategy, or that the strategy chosen by counsel has

ultimately proved unsuccessful, does not establish a denial of the effective assistance of counsel."

*People v. Fuller*, 205 Ill. 2d 308, 331 (2002).

¶ 26    Even assuming, *arguendo*, counsels' representation was deficient, defendant's allegations of prejudice are pure speculation. We are not persuaded that the outcome of this case would have been different absent evidence of Rogelio's gang affiliation. We acknowledge that gang evidence can be highly prejudicial (see *People v. Roman*, 2013 IL App (1st) 110882, ¶ 28), but cannot ignore the fact that Rogelio's gang ties supported defendant's theory of defense in this case. In any event, it is unlikely that Jose was unduly prejudiced by evidence that Rogelio was a gang member.

¶ 27                                        Hearsay

¶ 28    During the State's case in chief, Officer De Leon testified, without objection, that he received a radio dispatch of shots being fired at police at or near Hirsch Street. Officer Valdez likewise heard a radio call for assistance because the officers "had been shot at" and "Officer Yi had indicated that there was a weapon used in the crime." On cross-examination, Officer Valdez confirmed hearing a radio transmission that the police "were being shot at and they needed assistance." Jose argues that defense counsel's failure to object to "inadmissible hearsay" at trial was objectively unreasonable and deprived him of a fair trial.

¶ 29    A defendant is guaranteed the right to confront the witnesses against him by the confrontation clauses of both the United States and Illinois Constitutions. U.S. Const., amend. VI, XIV; Ill. Const. 1970, art. 1, § 8. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is generally inadmissible, because the declarant is not available for cross-examination. *People v. Smith*, 141 Ill. 2d 40, 76-77 (1990); *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004) ("The fundamental reason for excluding hearsay is the lack of an opportunity to cross-examine the declarant.").

¶ 30    An exception exists when the evidence is "offered for the limited purpose of showing the course of a police investigation where such testimony is necessary to fully explain the State's case to the trier of fact." *Jura*, 352 Ill. App. 3d at 1085. "A police officer may testify regarding the steps

taken in investigating a crime and describe the events leading up to the defendant's arrest when the evidence satisfied some relevant nonhearsay purpose." *Id.* at 1086.

¶ 31        Relying on *Jura*, defendant argues that "these improper hearsay police communications . . . went to the heart of the issue of guilt or innocence – whether Jose shot at the officers or whether the gun discharged accidentally." In response, the State asserts that the radio dispatches explained why the "police went to a specific location and eventually stopped a fleeing car with defendant in it" and how the weapon was recovered. Unlike in *Jura*, the contents of the radio calls at issue in this case did not elaborate on the details of the offense or contain any information and/or description of the alleged offender(s). 352 Ill. App. 3d 1086, 1087 (2004). Here, the testimony was limited to the steps of the police investigation and was not offered as substantive evidence of defendant's guilt.

¶ 32        Even assuming, *arguendo*, that the foregoing testimony was inadmissible hearsay, Jose has not satisfied the prejudice prong of our analysis. (*People v. Towns*, 174 Ill. 2d 453, 469 (1996)). Other than to state the reason for their actions, the officers did not dwell on the details of the radio transmissions. Furthermore, the radio calls were not mentioned in either opening statements or closing arguments. Finally, both Officer Yi and Officer Theodorides, the sources of the radio transmissions, testified at trial and were subject to cross-examination. Compare *Jura*, 352 Ill. App. 3d 1080 (Ineffective assistance of counsel where hearsay was used as substantive evidence to prove defendant guilty, and "concerned citizen" who provided information was never produced as a witness and subject to cross-examination.) For all these reasons, defendant is unable to show that the outcome of this trial would have been different absent admission of this evidence.

¶ 33        Jose also argues that Ms. Barganska improperly elicited his testimony that when the SUV was stopped, officers "came to my door and they were saying I was the shooter." Since Jose also

volunteered that he "didn't shoot nobody" during the same interchange, this argument is unconvincing.

¶ 34                                                    GSR

¶ 35         We next address defendant's claim that Mr. Adams failed to utilize exculpatory evidence that Diego tested positive for GSR in his defense. Attorneys are obligated to explore all readily available sources of evidence that might benefit their client. *People v. Irvine*, 379 Ill. App. 3d 116, 130 (2008). The failure to investigate and develop a defense has been found to be ineffective assistance of counsel, because defense counsel has a legal and ethical obligation to explore and investigate a client's case. *Id.*

¶ 36         Apparently, Mr. Adams did not realize that Diego had tested positive for GSR until after the trial had commenced. Counsel's performance in this respect was arguably deficient, as "it cannot be seriously contended that defendant's attorney[] made a reasonable strategic decision not to present evidence of which [he was] unaware." *People v. Kubat*, 114 Ill. 2d 424, 447 (1986) (Simon, J., dissenting). However, even though counsel's performance may have been deficient under the first prong of *Strickland*, that does not conclusively establish that counsel was ineffective. As the Court explained in *Strickland,* "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution," as "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691–92.

¶ 37         Defendant argues that "[a]dmitting Diego's positive GSR test could have 'alter[ed] the entire evidentiary picture' and potentially changed counsel's theory of defense *** particularly because a police officer at trial identified Diego as the SUV's front passenger." This argument ignores defendant's own testimony that Rogelio, not Diego, threw the gun from the back of the vehicle during the chase. Evidence that Diego tested positive for GSR would have completely

undermined Jose's testimony. Accordingly, we fail to see how evidence of Diego's GSR test results would have changed the outcome in this case.

¶ 38                    Defense Counsel's Behavior and Closing Arguments

¶ 39        Defendant argues that Mr. Adams was "erratic" and "unprofessional" throughout the proceedings and that Ms. Barganska misrepresented the law during her closing argument. Although Jose asserts that the trial judge "effectively" barred Mr. Adams from continuing his representation of defendant, the record shows otherwise (i.e., Mr. Adams continued to make objections during the trial, participated in the jury instruction conference, and was consulted by the judge regarding exhibits before jury deliberations).

¶ 40        During closing arguments, the trial judge corrected Ms. Barganska when she misstated the reasonable doubt standard as "beyond any reasonable doubt." He also admonished her for arguing that Rogelio "has something to lose" because he "doesn't know if he can be prosecuted for anything else by the state." Defendant maintains that these arguments "raised two damaging conclusions in the minds of the jurors: either Barganska did not know the law or she was attempting to mislead the jury in order to unfairly aid her client."

¶ 41        A defendant is entitled to competent, not perfect counsel. *People v. Palmer*, 162 Il. 2d 465, 476 (1994). "[M]istakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent." *Id*. Here, counsel presented a coherent defense. We do not find that Mr. Adams' isolated outbursts or Ms. Barganska's minor mistakes "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Therefore, defendant has not established that he was deprived of his constitutional right to the effective assistance of counsel at trial.

¶ 42                                     Motion for New Trial

¶ 43         At the posttrial hearing, Mr. Adams testified that he did not believe he prepared Jose and Rogelio "well enough to take the stand." In a similar vein, Ms. Barganska felt that she should have personally prepared the witnesses for their testimony.

¶ 44         "Incompetency of a trial lawyer cannot be judged by what he or she feels he should have done after the trial is over. After a trial, whether it be civil or criminal, every lawyer, no matter how experienced, can think of a number of things he or she should have said or done as well as matters that should have remained unsaid or undone. The test of incompetency by a trial, post-trial, or appellate lawyer is based on a showing that the counsel's performance fell below an objective standard of reasonableness and was prejudicial to the defense." *People v. Martin*, 271 Ill. App. 3d 346, 355 (1995).

¶ 45         Although Mr. Adams thought Jose's testimony was credible, the jury obviously disagreed. "Through the lens of hindsight," Mr. Adams regrets calling Jose to the stand. However, defendant fails to explain how additional preparation would have improved his credibility with the jury or changed the outcome of this case. "Evaluat[ing] counsel's performance from his perspective at the time," as we must, we cannot say that Mr. Adams was incompetent. *People v. Perry*, 224 Ill. 2d 312, 344 (2007).

¶ 46         Regarding Ms. Barganska, the judge found that "this idea that [she] was unprepared . . . is completely inconsistent with the work that I saw her do in court." In addition, although this was Ms. Barganska's first criminal trial, limited experience is not a circumstance which this court has held to constitute *per se* ineffective assistance of counsel." *People v. Pecoraco*, 175 Ill. 2d 294 (1997), citing People *v. Lear*, 175 Ill. 2d 262, 274 (1997).

¶ 47        Accordingly, for the foregoing reasons, we affirm the judgment of the circuit court of cook county.

¶ 48        Affirmed.