**Robert KUBAT, Petitioner–Appellant, Cross–Appellee,**

v.

**James THIERET, Warden, and Neil F. Hartigan, Attorney General of Illinois, Respondents–Appellees, Cross–Appellants.**

**Nos. 88–1440, 88–1520.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1988.

Decided Jan. 24, 1989.

As Amended Jan. 26, 1989.

Rehearing and Rehearing En Banc Denied March 15, 1989.

David E. Bindi, Asst. Atty. Gen., Chicago, Ill., for petitioner-appellant, cross-appellee.

Jonathan Haile, James C. Craven, P.C., Springfield, Ill., for respondents-appellees, cross-appellants.

Before FLAUM, RIPPLE and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Petitioner Robert Kubat was convicted by a jury in Illinois state court of aggravated kidnapping and murder. After a separate sentencing hearing, the same jury sentenced Kubat to death. On direct appeal, the Illinois Supreme Court affirmed both the conviction and the death sentence. *People v. Kubat*, 94 Ill.2d 437, 69 Ill.Dec. 30, 447 N.E.2d 247 (1983) [*"Kubat I"*], *cert. denied, Kubat v. Illinois*, 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983). Kubat filed a petition for post-conviction relief. After an evidentiary hearing, the Illinois trial court denied the petition, and the Illinois Supreme Court affirmed. *People v. Kubat*, 114 Ill.2d 424, 103 Ill.Dec. 90, 501 N.E.2d 111 (1986) [*"Kubat II"*], *cert. denied, Kubat v. Illinois*, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987), *reh'g denied, Kubat v. Illinois*, — U.S. —,

107 S.Ct. 2471, 95 L.Ed.2d 879 (1987). Kubat then filed a petition for a writ of habeas corpus asking the district court to vacate both his conviction and his sentence. The district court denied the petition with respect to Kubat's conviction, but granted the petition with respect to his sentence. *Kubat v. Thieret*, 679 F.Supp. 788 (N.D.Ill. 1988). Both Kubat and the state appeal from the adverse portions of the district court's order.

Kubat challenges his conviction on the following grounds: (1) violation of due process resulting from impermissibly suggestive photo identification procedures and unreliable in-court identification testimony; (2) violation of the sixth amendment right to effective assistance of counsel during trial; and (3) violation of due process by the trial judge's failure to instruct the jury, *sua sponte*, on a lesser included offense. With respect to the death sentence, the state challenges the district court's ruling that: (1) counsel rendered constitutionally ineffective assistance during the sentencing hearing; and (2) the trial judge committed plain error when he instructed the jury that a unanimous verdict was required to preclude imposition of the death penalty. In addition, the state points out that should this court reinstate Kubat's sentence, we would be required to address constitutional objections to the Illinois death penalty statute raised in Kubat's petition. For the reasons stated in this opinion, we affirm the judgment of the district court, and we therefore do not reach the constitutionality of the statute.

I.

The facts of this case have been set out in detail in two prior state court opinions, *Kubat I*, 94 Ill.2d 437, 69 Ill.Dec. 30, 447 N.E.2d 247; *Kubat II*, 114 Ill.2d 424, 103 Ill.Dec. 90, 501 N.E.2d 111, and thoroughly reviewed in the district court's opinion, *Kubat v. Thieret*, 679 F.Supp. 788 (N.D.Ill. 1988). The following summary is abstracted from those opinions and from the trial transcripts and presents only the facts relevant to this appeal. The parties do not dispute the state court factual findings

and, pursuant to 28 U.S.C. § 2254(d), we presume their correctness.

In the early afternoon of November 2, 1979, the body of Lydia Hyde was found along a highway in Illinois, near the Wisconsin border. Ms. Hyde had been shot in the head at close range. The chief prosecution witness was Carolyn Sue Quick, former wife of defendant Kubat and admitted participant in the abduction of Ms. Hyde. In exchange for her testimony, the state dismissed the charges against her.

Quick testified as follows. At approximately 11:00 p.m. on November 1, 1979, she met Kubat at a bar in the Chicago area. They stayed at the bar until past midnight, visited a second bar, and in the early hours of November 2 drove to Kenosha, Wisconsin, in Kubat's white station wagon. In Kenosha, they parked and napped at a gas station until morning and then visited several restaurant/bars, including the "Back Door" and the "Coffee And."

When the couple first reached the Back Door, an employee informed them that the restaurant was closed. They returned shortly after 11:00 a.m. when the restaurant opened. While there, they had a lengthy conversation with the owner, Jesse Lopez. The owner's wife, Nora Lopez, served them a sandwich, which they shared. They spoke to Sandra Lawson, the employee who had earlier informed them that the restaurant was closed. Quick commented about the owner's "beautiful gray hair," and Sandra Lawson responded to the effect that "it ought to be pretty, he combs it all the time." Sandra Lawson asked if they would be staying for lunch, and Kubat responded that they would be leaving shortly.

After leaving the Back Door, Kubat and Quick drove to the Coffee And where Lydia Hyde was alone, bartending. While the two sat at the bar, a man came down from upstairs, mixed two drinks, and left. A woman later came downstairs, mixed drinks, and left. Kubat then displayed a gun and directed Ms. Hyde to put the money from the cash register in a bag. Kubat directed Quick to empty the glasses from which they had drunk and place them in her purse. Quick and Kubat forced Ms. Hyde into Kubat's car and drove across the state line into Illinois. They stopped at a roadside sign where Kubat told Ms. Hyde to get out of the car, hold the sign, and face west. As Ms. Hyde complied, Kubat shot her in the head.

Kubat and Quick then visited several more bars, including the "M & D" lounge where the two had a conversation with the owners, Michael and Delores Pagden, and their son, Thomas Pagden. Quick gave Thomas Pagden the glasses she had taken from the Coffee And.

That night, Kubat and Quick stayed in a motel. Kubat left the following morning at about 7:00 a.m. Thus, according to Quick's testimony, she was continuously with Kubat from 11:00 p.m. on November 1 to 7:00 a.m. on November 3.

The state presented numerous witnesses to corroborate Quick's testimony. The witnesses included Jesse Lopez, Nora Lopez and Sandra Lawson from the Back Door; the man and woman at the Coffee And who had separately come downstairs, mixed drinks, and left; Michael, Delores, and Thomas Pagden from the M & D; and various employees from the other establishments that Quick testified she and Kubat had visited. Many of the witnesses corroborated that a couple had visited their establishment and corroborated details of the visit but did not identify Kubat as the male of the couple. Five witnesses did identify Kubat as the male: Jesse Lopez, Nora Lopez, Sandra Lawson, Delores Pagden, and Thomas Pagden.

Kubat presented an alibi defense, contending as follows. On the morning of November 2, 1979, Kubat accompanied a friend, Francine Bejda, to the General Assistance office in Lyons Township where she picked up a rent-assistance check which was payable to Kubat as Bejda's landlord. At approximately 11:00 a.m., Bejda and Kubat visited "Lil's Tavern" in Chicago where they spoke to the owner, Lillian Tesnohlidek, and a regular customer, Charles Fleisig. Kubat attempted to cash the check at Lil's, but Ms. Tesnohlidek refused to cash

it. The two then stopped at Mario Brajkovich's tavern in Chicago. Mr. Brajkovich cashed the check.

The alibi was presented through the testimony of Nancy Schultz, Lillian Tesnohlidek, and Mario Brajkovich. The check, dated November 2, 1979, was also introduced into evidence. Nancy Schultz, a caseworker at General Assistance, testified that Bejda and a man fitting Kubat's description picked up the check on November 1 or 2. Lillian Tesnohlidek testified that Kubat, whom she had known for several years, visited her bar at approximately 11:00 a.m. on November 2 and asked to cash the rent-assistance check, but that she refused to cash it.[1] She testified that while at the bar Kubat had a conversation with another customer named Charlie. She also testified that Kubat was accompanied by his wife, "Sue" (not Bejda). Mario Brajkovich testified that he heard of Kubat's arrest about a week after it occurred, that four weeks earlier, on a Friday (indicating November 2) Kubat and a woman, not his wife, had visited his bar, and that on that day he cashed the rent-assistance check. The defense also called two witnesses to impeach Quick's credibility as to details of her marriage to Kubat and one witness to impeach Delores Pagden's testimony as to the date on which Quick and Kubat had visited her bar.

On rebuttal, the state called Ann Painter, the supervisor of General Assistance who had signed the rent-assistance check. She testified that she was not in her office during business hours on November 2, 1979; that she would not have signed the check prior to that date; and that therefore the check could not have been delivered to Francine Bejda on that date.

Additional facts will be developed in the course of this opinion.

## II.

As stated above, Kubat challenges his conviction on three grounds: (1) unreliable identification testimony; (2) ineffectiveness of counsel; and (3) failure to instruct on a lesser included offense.

### A.

### Identification Testimony

Kubat challenges the trial court's refusal to suppress the identification testimony of Jesse Lopez, Nora Lopez, and Sandra Lawson (the owners and employee at the Back Door). The facts of their identification are as follows. On November 26, 1979, three and a half weeks after the murder, police exhibited five color polaroid photographs to the personnel at the Back Door. Although all three witnesses were in the barroom during the interviews, each was interviewed separately at a distance from the others.[2] Of the five photographs shown to each of the witnesses, Kubat's photograph was different in format from the other four. The picture of Kubat was a long-range, full frontal view, showing him standing in a living room next to a television and couch, while the pictures of the other four men were head and shoulders close-ups. The suspect had been described as wearing glasses. In the array of five pictures, Kubat was the only man wearing glasses. Kubat's picture also lacked the clarity of the other four, and a glare reflecting off his glasses obscured his facial features. Each of the three witnesses tentatively identified Kubat from this initial array. Kubat contends that the differences in format and clarity between his picture and the other four and the fact that he was the only man wearing glasses rendered the photographic array unduly suggestive. He also asserts that the suggestiveness was unnecessary because he was in custody at the time and could have been

---

1. The check bore a notation indicating that it was no longer negotiable after ninety days. Ms. Tesnohlidek testified that she refused to cash the check because she thought the notation meant that the check could not be cashed until after ninety days had elapsed.

2. Testimony at trial indicated that the witnesses were individually interviewed at separate ends of the bar. The Illinois Supreme Court found that each witness was interviewed "without any other person in the immediate vicinity." *Kubat I*, 69 Ill.Dec. at 43, 447 N.E.2d at 260. Kubat does not challenge this finding.

required to pose for a non-suggestive photograph.

Three days later, on November 29, police showed seven black and white mug shots to Jesse Lopez. Nora Lopez and Sandra Lawson were not present. In this array, Kubat was not wearing glasses, while another man was. Kubat was the only man whose picture was repeated from the first array. An arrest date was visible on the bottom front of each mug shot. Jesse Lopez positively identified Kubat's photograph. Kubat contends that this second array was unduly suggestive because he was the only individual whose photograph was common to both arrays and because a mug shot was used in the second array thus implying to the witness that Kubat had been arrested since the previous viewing of the poloroids.[3] Moreover, his mug shot showed an arrest date of November 24, 1979, while the other mug shots showed arrest dates long prior to the murder of Lydia Hyde thus reinforcing the implication that he had been arrested for the murder.

Three months later, on February 26, police showed another array of seven black and white mug shots to Nora Lopez and Sandra Lawson. Both were present in the barroom but were interviewed separately. As in the second array shown to Jesse Lopez, a man other than Kubat was pictured in glasses, and Kubat's was the only picture common to the first array. In this array, the arrest dates were covered with a piece of paper. Nora Lopez positively identified Kubat. Sandra Lawson also identified him but expressed concern that she might have recognized his photograph because she had seen it in the newspaper. Kubat contends that this third array was unduly suggestive for the same reasons as the second array—recurrence of Kubat's picture and use of a mug shot, albeit with the arrest date covered.

Viewing the sequence of showings cumulatively, Kubat contends that suggestive techniques caused the witnesses to make tentative initial identifications of a blurry home picture of a man in glasses, and then to turn those tentative identifications into positive identifications upon viewing the subsequent mug shot. He further argues that the suggestive procedures were unnecessary because he was in custody and the witnesses (once they had made their initial, tentative identifications) could have been called in to view a line-up. Finally, Kubat asserts that the witnesses' in-court identification testimony was not independently reliable, citing in particular Sandra Lawson's doubts about having seen Kubat's picture in the newspaper.

■ A well settled two-part test is applied in determining the admissibility of challenged identification testimony. First, the defendant must establish that the identification procedure was unnecessarily suggestive. If the defendant meets this burden, the court considers whether the procedure was so unduly suggestive as to give rise to irreparable mistaken identification—or stated in the affirmative, whether the identification, viewed under the totality of circumstances, is reliable despite the suggestive procedure. *See Manson v. Brathwaite*, 432 U.S. 98, 107–14, 97 S.Ct. 2243, 2249–53, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 198–99, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *United States v. L'Allier*, 838 F.2d 234, 239 (7th Cir.1988); *United States v. Kord*, 836 F.2d 368, 373 (7th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988); *United States v. Briggs*, 700 F.2d 408, 412–13 (7th Cir.), *cert. denied,* 461 U.S. 947, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983); *United States v. Phillips*, 640 F.2d 87, 94 (7th Cir.), *cert. denied,* 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981).

■ In this case, Kubat is correct that the circumstances of the photo identifications were less than optimal. There is no

---

**3.** The state asserts that Kubat's argument as to use of a mug shot was not raised in state court and thus waived. Our review of the record shows, however, that Kubat did raise the argument in his brief on direct appeal to the Illinois Supreme Court.

doubt that the identification procedures employed by the investigative officers could have been handled more carefully. The three witnesses were initially interviewed in the same room; the first photograph of Kubat was different in format and clarity than the others in the array; and Kubat was the only man in that array wearing glasses. In the second array shown to Jesse Lopez, the arrest dates on the mug shots were visible, and the arrest date on Kubat's picture coincides with the approximate time of the crime. In the second showing to Nora Lopez and Sandra Lawson, the two were again interviewed in the same room. Kubat was the only person whose picture appeared in all three photo arrays. Finally, the Illinois Supreme Court itself acknowledged its disapproval of the use of photographs when a suspect is in custody and a line-up is feasible. *Kubat I,* 69 Ill.Dec. at 44–45, 447 N.E.2d at 261–62. However, while we disapprove of the procedures used in these identification interviews, on habeas review our role is not to mandate optimal procedures to the state courts. Rather, our role is to protect against constitutional error.

On this record, and especially upon independent viewing of the challenged arrays, we cannot say that the identification procedures were so suggestive as to violate Kubat's due process rights. First, the initial blurred photo of Kubat bears little resemblance to the subsequent mug shot—so little that it is highly unlikely that the witnesses selected the mug shot from a memory of the first photo. In fact, the blurriness of the first photo may explain why the witnesses initially made only tentative identifications. Second, in the subsequent arrays, a person other than Kubat was depicted in glasses, indicating that the presence or absence of glasses had no influence on the witnesses' selections. Third, as to the use of the mug shots, the district court noted that the Eighth Circuit has found that the use of mug shots showing arrest

dates is not necessarily suggestive. *United States v. Love,* 692 F.2d 1147, 1150–51 (8th Cir.1980). In that case, the witness testified that she had not even noticed the dates. In this case, Kubat presented no testimony on whether Jesse Lopez noticed the dates or was influenced by them. Absent any evidence that the witness was influenced by the arrest dates, we do not consider the mere use of a mug shot—even after the witness had initially viewed an ordinary photograph—to be unduly suggestive. Finally, the witnesses were apparently interviewed at separate ends of the bar, and Kubat presented no evidence that they conferred or observed the other interviews.

■ Even if we were to find that the identification procedures were unnecessarily suggestive, reversal would still not be warranted, for we also find that under the totality of circumstances the identification testimony was reliable. In *Neil v. Biggers,* the Supreme Court set out the factors to be considered in evaluating reliability:

■ opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

409 U.S. at 199–200, 93 S.Ct. at 382. Applying these factors, we find: (1) the witnesses had ample opportunity to view the couple in the bar—approximately 45 minutes at close range;[4] (2) the witnesses' attention was drawn to the couple—they were strangers rather than regular customers; Jesse Lopez had a lengthy conversation with them; Sandra Lawson recalled details of her conversation with them; and Nora Lopez recalled serving them a sandwich and that they shared it; (3) the witnesses had given no prior description, so this factor cannot be weighed;[5] (4) Jesse

4. Jesse Lopez was within a few feet of the couple during their entire stay at the bar. Nora Lopez was cooking behind the bar, within several feet of the couple. And, although Sandra Lopez was walking around tending to her chores, she was in the immediate vicinity of the

couple and stopped more than once to chat with them.

5. Kubat argues that the absence of prior descriptions should be weighed against the admissibility of the identifications. We disagree.

and Nora Lopez expressed certainty in selecting the mug shot, and although Sandra Lawson expressed concern about seeing the picture in the newspaper, she testified at trial only that Kubat looked like the man in the bar, and her concerns about the newspaper were disclosed to the jury—thus her concerns went to weight not admissibility; and (5) although the length of time from the murder to the second, positive identifications was substantial—27 days for Jesse Lopez and nearly four months for Nora Lopez and Sandra Lawson—it was not so inordinate as to outweigh the other factors.

On these facts, we cannot say that Kubat was denied a fair trial by the admission of the challenged identification testimony.

### B.

### Effectiveness of Counsel

Kubat challenges the effectiveness of his attorneys [6] on five grounds: (1) failure to call alibi witnesses; (2) failure to investigate physical evidence; (3) failure to fully impeach Quick on the question of her honesty; (4) failure to establish the description of the getaway car; and (5) failure to tender an instruction on unlawful restraint.

In analyzing a sixth amendment challenge to the effectiveness of counsel, we are bound by the stringent standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Strickland*, the Supreme Court held that a defendant bears the burden of showing: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. As to deficient performance, the Court stated:

> The inquiry is whether the identification procedures were suggestive. Where there is a discrepancy between a witness's prior description and the actual description of a suspect, that discrepancy might indicate that the witness's identification was influenced by a suggestive procedure. However, no inference can be drawn from the absence of a prior description. In other words, a prior description can bolster (if accurate) or erode (if inaccurate) confidence in the identification procedure. One can criticize the fact that no prior description was elicited from these witnesses, and thus this factor is

> [T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.
>
> Judicial scrutiny of counsel's performance must be highly deferential.... [E]very effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's·conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). The Court explained the prejudice component as follows:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* 466 U.S. at 694, 104 S.Ct. at 2068.

■ The Court went on to explain that if the defendant makes an insufficient showing on either component of the inquiry—performance or prejudice—a court need not address the other component. *Id.* at 697, 104 S.Ct. at 2069. Thus, the defendant bears a heavy burden in proving a claim of

not available for us to measure, but one cannot conclude that the absence of a description should either bolster or erode our confidence in the procedures used.

6. Kubat had two attorneys: a public defender and an attorney retained by Kubat's family to assist the public defender. Kubat's family retained the second attorney after Kubat twice unsuccessfully moved the court to appoint a different public defender to his case.

ineffective assistance of counsel. In evaluating the decisions of counsel, we must apply the highly deferential standard set out above and ask whether those decisions, viewed from counsel's perspective at the time, might be considered sound trial strategy. In evaluating the effect of any errors on the part of counsel, we must ask not whether there is a possibility that the outcome was affected but whether there is a reasonable probability that absent the error the result would have been different.

### 1. Failure to Call Alibi Witnesses

At the post-conviction hearing, several witnesses who were not called at trial testified on Kubat's behalf, including Francine Bejda, Sister Alberto Surico, and Margie Elea. Francine Bejda testified that, had she been called as a witness at trial, she would have testified that on the morning of November 2, Kubat accompanied her to the Lyons Township General Assistance office where she picked up her rent-assistance check; that after picking up the check she and Kubat went to Lil's Tavern where Kubat unsuccessfully attempted to cash the check; that while at Lil's Kubat had a conversation with another customer, Charles Fleisig; and that after leaving Lil's she and Kubat went to a bar owned by Mario and that Mario cashed the check.

Charles Fleisig was deceased at the time of the hearing. However, Sister Alberto Surico testified that before he died Fleisig executed an affidavit in her presence. The affidavit stated that on November 2, at 11:00 a.m., Fleisig was with Kubat and Francine Bejda at Lil's Tavern, that he was available to testify at trial, but that he was not subpoenaed.

Margie Elea testified that, if called at trial, she would have testified that she was the manager of a gas station in Highland, Indiana; that in the late evening of November 1, 1979, Kubat and a woman entered the gas station in a white station wagon; that Kubat told her that the car had broken down; and that Kubat was still at the station when she left at 2:00 a.m. on November 2, 1979.

Kubat claims that the performance of defense counsel was deficient because of counsel's failure to call Francine Bejda, Charles Fleisig, and Margie Elea as witnesses at his trial. He argues in particular that the failure to call Francine Bejda was inexcusable because it allowed the prosecutor to assert in closing argument that Ms. Bejda (who was sitting in the courtroom) did not take the witness stand because she would not have supported Kubat's alibi. We will discuss each witness separately.

#### a. Francine Bejda

■ At the post-conviction hearing, Ms. Bejda testified that at the time of Kubat's trial her recollection of the date on which she and Kubat had picked up her rent-assistance check was "vague." She testified that she had memories of the events (going to the General Assistance Office, Lil's tavern, and Mario's tavern) but that she "didn't know where to put them." It was only after Ms. Bejda underwent deep relaxation sessions that she was able to reconstruct the events and come to the conclusion that they occurred on November 2, 1979. Prior to the trial, however, Ms. Bejda had told Kubat's attorney that she was not sure of the exact times or places.

In addition, Ms. Bejda testified that during September, 1979, she lived with Kubat and was sleeping with him. During this same time, she testified that Carolyn Quick was also living in Kubat's house. Other evidence established that Kubat and Quick were married in late August, 1979, and were still married during the time that Bejda, Quick, and Kubat lived together.

In light of these facts, we cannot say that counsel's decision not to call Francine Bejda as a witness constituted deficient performance. Considering Ms. Bejda's uncertainty as to the date of the events comprising Kubat's alibi and the unusual living arrangement among Bejda, Kubat, and Quick, Ms. Bejda's testimony would have been subject to severe attack on cross-examination. It is possible that the jury would have reacted negatively to Ms. Bejda and to her testimony, and that Kubat's defense would not have been helped but,

perhaps, even hurt. Counsel chose instead to call three unbiased witnesses (Nancy Schultz, Lillian Tesnohlidek, and Mario Brajkovich) who were not subject to such potentially destructive cross-examination. Under these circumstances, the decision not to call Ms. Bejda as a witness can be considered sound trial strategy.

We note that Justice Simon, in his dissent from the Illinois Supreme Court's decision on Kubat's post-conviction appeal, believed that it was "the height of negligence to give prosecutors a powerful rhetorical tool: that Bejda was not put on the stand because she would not support the defendant's alibi." *Kubat II,* 103 Ill.Dec. at 98, 501 N.E.2d at 119. We are not unmindful of Justice Simon's concern. However, we believe defense counsel was faced with a difficult decision on whether to have Ms. Bejda testify, and we are guided by the Supreme Court's admonition to "eliminate the distorting effects of hindsight ... and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689, 104 S.Ct. at 2065. Given the difficulty of the decision, we cannot in hindsight say that counsel's choice was professionally incompetent.

b. Charles Fleisig

■ The district court found that, had Charles Fleisig been called as witness, his testimony would merely have been cumulative to that of Lillian Tesnohlidek, and therefore Kubat was not prejudiced by the absence of Mr. Fleisig's testimony. We disagree that Mr. Fleisig's testimony was purely cumulative. Lillian Tesnohlidek testified that Kubat was at her bar on November 2 with his wife, "Sue." Mr. Fleisig's affidavit stated that Kubat was in the tavern with Francine Bejda on that day. It is true, as the state argues, that the key to the alibi defense was the date, and that as to the fact of the date Mr. Fleisig's testimony would have been cumulative. However, Mr. Fleisig would also have testified that Kubat was with Ms. Bejda, not with his wife. This testimony might have discred-

ited the state's argument that because Lillian Tesnohlidek thought Kubat was with his wife, Ms. Tesnohlidek must have been mistaken about the date.

We find, however, that counsel's failure to call Charles Fleisig did not render counsel's performance deficient. Apparently, defense counsel intended to call Mr. Fleisig and had made an unsuccessful attempt to locate and subpoena him on the night before the last day of trial. *Kubat II,* 103 Ill.Dec. at 9394, 501 N.E.2d at 114–15 (majority) and 103 Ill.Dec. at 98, 501 N.E.2d at 119 (Simon, J., dissenting).[7] Kubat argues that counsel should have subpoenaed Mr. Fleisig well in advance of trial and that the failure to do so illustrates counsel's incompetence. We disagree. Trial attorneys often choose not to subpoena a willing witness in order to avoid the possible intimidating effect, preferring instead to informally request the witness's presence at trial. Moreover, the record contains no details of the circumstances surrounding the attempt to locate and subpoena Charles Fleisig nor any information concerning interviews with him or what arrangement, if any, counsel had made to inform him of the day his testimony would be required. In the absence of any evidence on this point, we cannot say that the failure to locate Mr. Fleisig constituted deficient performance.

c. Margie Elea

■ Initially, we note that Margie Elea differed from the other two potential witnesses who were not called because she was not, strictly speaking, an alibi witness. She testified at the post-conviction hearing that she saw Kubat and a woman at her gas station in Indiana on the night before the murder of Lydia Hyde. Her testimony did not go to Kubat's whereabouts on the day of the murder. This is not to say her testimony would not have been helpful, for it might have contradicted a portion of Quick's testimony. We note that she was not literally an alibi witness only to place in

7. The record on this point is very sparse. Kubat asserts in his brief that defense counsel made a belated attempt to locate and subpoena Mr. Fleisig but gives no citation to the post-conviction hearing transcript. The state did not challenge the assertion in its responsive brief.

perspective counsel's decision not to call her.

The district court suggested three reasons why counsel might have chosen not to call Ms. Elea. First, the district court thought that "Ms. Elea's testimony at the post-conviction proceedings raised some doubt that November 1 was in fact the date she observed the incidents she described." 679 F.Supp. at 806. Second, Ms. Elea's testimony would have raised questions about the identity and whereabouts of the woman who was allegedly with Kubat at Ms. Elea's gas station. Finally, the district court considered trial counsel's apparent strategy to limit the alibi defense to Kubat's whereabouts on November 2 to be reasonable.

We believe that the question of whether defense counsel made a competent decision not to call Ms. Elea is very close. First, as to Ms. Elea's certainty about the date on which she testified she saw Kubat, our reading of the post-conviction transcript reveals that Ms. Elea was quite certain of the date and that her certainty could not be shaken on cross-examination. It was only the method by which she had fixed the date at November 1 that was at all questionable —she recalled that she had done inventory that night and had visited her mother two days later. Second, while Ms. Elea's testimony might have raised questions about the unidentified woman and about Kubat's whereabouts between the time he was allegedly at Ms. Elea's station and the time he allegedly accompanied Ms. Bejda to the General Assistance Office, those questions might not have outweighed the positive value of Ms. Elea's testimony, given that she was apparently a neutral, unbiased witness who would have directly contradicted Quick's testimony that Kubat was in Wisconsin on that night. Finally, while in some cases limiting the time period of an alibi defense might be advisable, in this case, where the three alibi witnesses who were called were all fairly weak, a good case can be made that expanding the period of the alibi and calling Ms. Elea could only have helped the defense.

On the other hand, we note that Ms. Elea was subpoenaed by both the defense and the prosecution to testify at the trial. We do not know why the prosecution subpoenaed her. Further, we know that she was waiting to be called when she was told that she could go home. Thus, we know that defense counsel made a very conscious decision not to call her. Considering these factors and the fact that Kubat did not depose or call his attorneys to testify at the post-conviction hearing, we question whether Kubat has carried his burden of rebutting *Strickland*'s strong presumption of reasonable conduct.

■ Even accepting that counsel's decision not to call Ms. Elea was professionally incompetent, however, we find that Kubat has not demonstrated that he was prejudiced by the error. The state presented five witnesses who identified Kubat as the male who was with Quick on November 2 and numerous other witnesses who corroborated details of Quick's testimony. The question is whether there is a reasonable probability that had the jury heard Ms. Elea's testimony, the verdict would have been different. We believe the answer is no.

There is absolutely no doubt that Carolyn Quick participated in the abduction and murder of Lydia Hyde. The jury believed Carolyn Quick and believed the eyewitnesses who testified that Kubat was the man who accompanied Quick. One of those witnesses, Jesse Lopez, testified that he carried on a half-hour conversation with Kubat. Mr. Lopez recalled that Kubat was wearing a distinctive cap and that he ordered an Old Style beer and two shots of CC. Another, Delores Padgen, who had known Kubat for years, testified that while in her bar Kubat drank an Old Style beer and a shot of CC, which she knew to be his usual drink. Sandra Lawson, recalled details of an exchange between Quick, Kubat, Jesse Lopez and herself regarding Mr. Lopez' white hair. Nora Lopez testified that she had served the couple a sandwich which they shared. There was no dispute as to the day or time of these events nor as to the presence of Quick. The only dispute

was whether Kubat was the man accompanying Quick. Ms. Elèa's testimony, if heard, would only have placed Kubat in northern Indiana on the night before the murder. While it would have contradicted Quick's testimony as to the events of that night, it would not have contradicted the testimony of the state's eyewitnesses as to events on the day of the murder. The jury did not accept the testimony of the three unbiased alibi witnesses who placed Kubat in Chicago on the day of the murder. There is no reason to think that had the jury heard Ms. Elea's testimony the verdict would have been different.

In summary, we conclude that defense counsel's decisions not to call Francine Bejda and Margie Elea and counsel's failure to call Charles Fleisig did not render counsel's assistance constitutionally ineffective.[8]

### 2. Failure to Investigate Physical Evidence

■ At trial, the prosecution introduced evidence of a tire track that was found near the victim's body and also presented evidence that eight days after the murder Kubat purchased new tires for his car. During closing argument the state argued that Kubat disposed of the old tires to avoid detection. At the post-conviction hearing, an insurance adjuster testified that Kubat's old tires, which he had examined, were made by Uniroyal. The prosecution stipulated that the tire track found near the victim's body could not have been made by Uniroyal tires. Kubat claims that defense counsel's failure to present the insurance adjuster's testimony at trial constituted ineffective assistance.

We find that Kubat was not prejudiced by the omission of the adjuster's testimony. Although that testimony combined with the state's stipulation negated the possibility that the tire track was made by Kubat's old

tires, the testimony would have paled in comparison to the principal evidence against Kubat: Carolyn Quick's testimony and the corroborating witnesses' testimony. The tire track evidence merely allowed an inference to be drawn by the jury. That inference was far from crucial to the state's case. Indeed, if the defense had been prepared to present the adjuster's testimony at trial and the state had been willing to stipulate that the track could not have been made by Uniroyal tires (or Kubat was prepared to prove that fact), the state might well have not introduced the track into evidence. In that case, the jury would not have been given the opportunity to draw the adverse inference. However, the absence of the inference would not have weakened the state's case in any significant way.

Moreover, as to the deficiency prong of *Strickland*, defense counsel argued in closing that the state had failed to link the tire track to Kubat's car. Thus, even without the adjuster's testimony defense counsel rebutted the adverse inference. Under those circumstances, we cannot say that defense counsel was professionally incompetent for not calling the adjuster.

### 3. Failure to Fully Impeach Quick for Honesty

■ At the post-conviction hearing, 12 witnesses testified that Carolyn Quick had a reputation in the community for dishonesty. Kubat claims that his attorneys were incompetent for failing to call these witnesses at trial. The district court held that counsel's decision to omit reputation evidence was sound for two reasons. First, during extensive cross-examination of Quick at trial, defense counsel successfully established Quick's animosity toward Kubat, the fact that she had threatened to kill

---

**8.** We also note that we have considered the recent decision in *Montgomery v. Petersen,* 846 F.2d 407 (7th Cir.1988), which Kubat brought to the attention of the court under Circuit Rule 28(i), and we find the case to be distinguishable. In *Montgomery,* unlike the instant case, counsel failed to make any effort to investigate or interview a potential witness. Moreover, *Montgomery* presented the rare case in which the preju-

dice component of *Strickland* was easily proven. The defendant had been separately tried in two counties for two burglaries that occurred on the same day. In one trial, defense counsel called an alibi witness, and the defendant was acquitted. In the second trial, the only difference was that defense counsel failed to call the very same alibi witness, and the defendant was convicted.

him, the fact that she may have committed perjury to annul her second marriage to him, the fact that she had attempted to have him arrested on a previous occasion, and the fact that she was testifying in exchange for immunity. Thus, Kubat's attorneys employed an alternative method of impeachment other than calling reputation witnesses.

Second, all of the reputation witnesses who testified at the post-conviction hearing stated that they were good friends of Kubat. As the district court said, "[e]xperience teaches that individuals who are close friends or associates of a party are the least desirable impeachment witnesses because of the ease with which their testimony can be discredited." *Id.* at 808. (citing Lane, *Goldstein Trial Technique* § 20.87 (3d ed. 1986) (advising that persons closely related or associated with a party should not be used to impeach the character of an opposing witness)).

We agree with the district court that, given the alternative impeachment methods used by counsel and the advisability of calling only impartial impeachment witnesses, the decision to omit reputation testimony was a reasonable trial strategy.

### 4. Failure to Establish Description of Getaway Car

■ At trial, two employees of the Coffee And, Dorothy Hawley and Dale Gonsky, testified on cross-examination that they had seen a gray automobile speeding out of the restaurant's parking lot around the time of Lydia Hyde's disappearance. At the post-conviction hearing, it was established that both witnesses had told investigators that the automobile might have been a two-door Chevrolet Monte Carlo. Kubat claims that his attorneys were incompetent for failing to establish at trial that the witnesses had seen a two-door Monte Carlo rather than a white station wagon.

We find, as did the district court, that the trial transcript shows that the witnesses equivocated about their earlier statements to investigators. The witnesses were quite reticent about describing the car and were uncertain about what they had told the investigators. Although defense counsel did not directly ask the witnesses what type of car they had observed, counsel highlighted the fact that they had described the car as grayish blue rather than white. Given the reticence of the witnesses and the successful attempt of counsel to establish that the car was gray not white, we cannot say that counsel was incompetent for failing to also establish the make of the car.

### 5. Failure to Tender an Instruction on Unlawful Restraint

■ Under the Illinois death penalty statute, a defendant convicted of first degree murder may be sentenced to death only if the jury finds the existence of a statutory aggravating factor. Ill.Rev.Stat. ch. 38, para. 9–1(b), (g) (1985). In Kubat's case, the aggravating factor was Kubat's conviction for aggravated kidnapping. *See id.* ch. 38, para. 9–1(b)(6)(c). Kubat claims that his attorneys should have tendered an instruction on the lesser included offense of unlawful restraint. He argues that had the jury convicted Kubat of the lesser included offense rather than aggravated kidnapping, the death penalty could not have been imposed, and therefore his attorneys were incompetent for ignoring this avenue for saving his life.

Both the district court and the Illinois Supreme Court found that tendering an instruction on unlawful restraint would have been inconsistent with Kubat's alibi defense and that, therefore, Kubat's attorneys could have reasonably chosen not to tender the instruction so as to avoid weakening the alibi defense. We agree. As the Ninth Circuit stated in a case similar to the instant case:

> [Defendant] elected to rely on his alibi defense. His counsel testified that as a tactical matter, arguing a lesser included offense concerning theft might have diluted the alibi defense and resulted in a loss of credibility. The district court properly accepted the [state] court's finding that not requesting the instruction was trial strategy. The decision not to

request a lesser included offense instruction falls within the wide range of reasonable professional representation. *Woratzeck v. Ricketts*, 820 F.2d 1450, 1455 (9th Cir.1987), *vacated on other grounds*, —— U.S. ——, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988).

Kubat argues, however, that his counsel did not make a strategic decision not to tender the instruction. Rather, he contends, his counsel negligently failed to even consider whether the instruction should be given. Kubat relies on an affidavit executed by one of his trial attorneys which stated that the matter was "never considered because Robert Kubat had consistently maintained that he was not in Wisconsin at the time of the crime." Kubat focuses on the words "never considered" to argue that counsel was incompetent. Reading the full statement of counsel, however, we find that the matter was not considered *"because"* Kubat had consistently maintained an alibi defense. Granted, the statement of counsel is susceptible to two interpretations—either that the option of tendering the instruction was not considered at all or that the option was not considered because of the alibi defense. However, given this ambiguity, and the general proposition that it is reasonable to forego a lesser included offense instruction where a defendant has presented an alibi defense, we find that Kubat has not met his burden of establishing that his attorneys' performance was deficient.[9]

█ Even if we were to find that counsel was incompetent for failing to tender the instruction, however, we would find that Kubat has not established that he was prejudiced by the deficiency. The difference between aggravated kidnapping and unlawful restraint is that the state must prove *secret* confinement, or intent to *secretly* confine, in order to establish aggravated kidnapping, whereas unlawful restraint contains no element of secrecy.

Under Illinois law, one can be secretly confined within the meaning of the kidnapping statute while sitting in a car moving on public roads. *People v. Kittle*, 140 Ill.App. 3d 951, 95 Ill.Dec. 260, 263, 489 N.E.2d 481, 484 (1986). In this case, the evidence showed that the victim was stuffed in a car at gunpoint, between two robbers, and driven across the state line for about seven miles. The evidence clearly established aggravated kidnapping. We do not believe that there was a reasonable probability that had the unlawful restraint instruction been given the outcome would have changed.

### C.

### Duty of Trial Judge to Give Lesser Included Offense Instructions

█ Kubat's final challenge to his conviction is that the trial judge should have instructed the jury, *sua sponte*, on the lesser included offense of unlawful restraint. Kubat claims that the failure to give the instruction denied the petitioner due process of law.

Kubat relies on only one case to support his argument. *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). In *Beck*, the Court held that a state may not statutorily preclude a defendant from seeking lesser included offense instructions, if the evidence could support a finding of guilty on the lesser offense and not guilty on the greater. This holding is far from a rule requiring judges to *sua sponte* instruct the jury on lesser included offenses.

In light of our holding above that Kubat's attorneys could reasonably have made a strategic decision not to tender the unlawful restraint instruction, it would be incongruous to hold that the trial judge had a duty to give the instruction. No federal court has imposed on trial judges a duty to *sua sponte* instruct on lesser included of-

---

**9.** Kubat also relies on *United States ex rel. Barnard v. Lane*, 819 F.2d 798 (7th Cir.1987). In that case, counsel was found to be ineffective for failing to tender justification and manslaughter instructions in a murder trial. There, however, the defendant admitted killing the vic- tim, so that without those instructions the defendant was left "with no defense at all." *Id.* at 803. Here, the absence of a lesser included offense instruction did not in any way erode Kubat's alibi defense.

fenses, and we agree with the district court that the wisdom of such a rule would be questionable. As the district court said, "[s]uch a ruling would compel the judge to present jury instructions at odds with the trial strategy of [defense] counsel." 679 F.Supp. at 810. Accordingly, we hold that the trial court did not violate Kubat's due process rights by not instructing the jury on the offense of unlawful restraint.

### III.

The state appeals from the district court's order vacating Kubat's death sentence. As stated above, the state challenges the district court's ruling that: (1) counsel rendered ineffective assistance during the sentencing hearing; and (2) the trial judge committed plain error when he instructed the jury that a unanimous verdict was required to preclude imposition of the death penalty.

Before turning to the merits of these issues, we must first outline the relevant provisions of the Illinois death penalty statute. Ill.Rev.Stat. ch. 38, § 9–1. Under the statute, after a defendant is convicted of murder, the state may request a separate sentencing hearing to determine whether the death penalty shall be imposed. § 9–1(d). The hearing proceeds in two stages. During the first stage, the sentencer[10] determines whether the defendant is eligible for the death penalty. For a defendant to be eligible for the death penalty, the state must prove beyond a reasonable doubt the existence of one of the statutorily enumerated aggravating factors. § 9–1(b), (f). In Kubat's case, the statutory aggravating factor was his conviction for aggravated kidnapping.

If the defendant is found eligible for the death penalty, the hearing proceeds to the second stage. During the second stage, the sentencer considers any and all relevant aggravating and mitigating factors.

The factors include, but are not limited to, those listed in the statute. § 9–1(c). Either side may present information relevant to aggravation and mitigation, and each side must be given the opportunity to rebut any information presented. The statute then provides:

> If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence the court shall sentence the defendant to death.
>
> Unless the jury unanimously finds that there are no mitigating factors sufficient to preclude the imposition of the death sentence the court shall sentence the defendant to a term of imprisonment. . . .

§ 9–1(g).

The issues on appeal concern the second stage of Kubat's sentencing hearing.

### A.

#### Ineffectiveness of Counsel

The district court held that Kubat's attorneys committed three errors during the second stage of sentencing that rendered their assistance constitutionally ineffective. The three errors were: (1) failure to investigate or present mitigating evidence; (2) the making of a bizarre and prejudicial closing argument;[11] and (3) failure to object to erroneous instructions. We will address the first two of these errors together under the heading "Defense at Sentencing" and will separately address the third.

#### 1. Defense at Sentencing

At the post-conviction hearing, fifteen character witnesses testified on Kubat's behalf. None of the witnesses were members of Kubat's family; most were neighbors and coworkers; all were well-respected citizens in their community; one was a deputy sheriff; and all stated that they would have testified on Kubat's behalf at

---

**10.** Usually, as in Kubat's case, the sentencer is the jury that determined the defendant's guilt. *See* Ill.Rev.Stat. ch. 38, § 9–1(d).

**11.** The state argues that the district court erred in considering the merits of Kubat's claim that his counsel's closing argument was ineffective.

The state correctly points out that on post-conviction appeal the Illinois Supreme Court ruled that Kubat had waived the claim by failing to raise it on direct appeal. The record clearly shows, however, that Kubat did in fact raise and argue the issue in his brief on direct appeal.

the sentencing hearing if they had been asked. Despite the availability of this impressive array of character witnesses, Kubat's counsel contacted only two of the fifteen before trial and called none of the fifteen to testify at the sentencing hearing.

In the district court, the state argued that Kubat's attorneys made a rational strategic decision to forego character testimony and to rely instead upon a plea for mercy during closing argument.[12] The district court found, however, that the closing argument was not a competent plea for mercy but was unintelligible and prejudicial to Kubat.

The district court held that the failure of Kubat's attorneys to present the testimony of the character witnesses and the giving of a closing argument which "could only have benefitted the prosecution," 679 F.Supp. at 812, resulted in constitutionally ineffective assistance of counsel. The district court treated the two errors both separately and in tandem. First, treating the errors separately, the district court held that under the Illinois death penalty statute, the defense bears the burden of producing evidence of mitigating factors sufficient to preclude the imposition of the death penalty. The district court held that even a well-executed plea for mercy cannot fulfill this burden; rather, the defense must present other mitigating evidence which, in this case, was the available character testimony. Consequently, the district court held that the failure to investigate and present the character testimony was professionally incompetent. Second, considering the errors in tandem, the district court held that even if a plea for mercy

could be considered an acceptable alternative strategy, the closing argument in this case "fell far below acceptable standards" and "only exacerbated the effect of counsel's failure to present mitigating evidence." 679 F.Supp. at 812.

In asserting that the district court erred, the state makes two arguments. First, the state contends that the district court erred in its interpretation of the Illinois death penalty statute—*i.e.*, that, contrary to the district court's view, the statute does not place a burden on the defense to produce mitigating evidence or to persuade the jury that the death penalty is inappropriate. Second, given that the defense bears no burden of producing mitigating evidence, the state contends that making a plea for mercy is a reasonable strategic alternative to presenting character testimony and that Kubat's counsel's closing argument was an acceptable plea for mercy.

■ With respect to the state's first argument, we find that we need not decide whether the statute places a burden on the defendant.[13] For even assuming that the state is correct and that the statute places no burden on the defendant, defense counsel's performance must still be evaluated for strategic competence. For example, in an ineffectiveness challenge to counsel's performance at the guilt stage of a trial, where the state clearly bears the burden of proving guilt beyond a reasonable doubt, the court must evaluate counsel's strategic decisions and performance to decide whether the representation fell within the "wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Thus, our decision turns on

---

**12.** The Illinois Supreme Court found that counsel's decision to omit character testimony was a strategic decision. *Kubat II,* 103 Ill.Dec. at 96, 501 N.E.2d at 117. The state argues that this finding is one of fact, entitled to the presumption of correctness required by 28 U.S.C. § 2254(d). We disagree. As the *Strickland* Court stated, "a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d)." 466 U.S. at 698, 104 S.Ct. at 2070. *See also Thomas v. Kemp,* 796 F.2d 1322, 1324 (11th Cir.1986) (§ 2254(d) presumption does not apply to a state court finding of effectiveness of counsel).

**13.** We note that interpreting the statute as placing a burden on the defendant to prove that the death penalty is inappropriate would raise a question of the statute's constitutionality under the eighth and fourteenth amendments. Indeed, Kubat's petition for a writ of habeas corpus asserted that: (1) the statute's provision for balancing the factors in aggravation and mitigation without requiring the state to bear a burden of proof offends due process; and (2) placing a burden on the defendant to demonstrate why the death penalty should not be imposed violates the eighth amendment.

the state's second argument which asserts that defense counsel made a competent strategic decision to omit character testimony and to instead make a plea for mercy, and that counsel competently executed that decision.

It is true, as the state contends, that in some cases counsel might reasonably make a decision to omit evidence in mitigation and rely instead on an alternative strategy, such as a plea for mercy. For example, in *Strickland,* the Supreme Court found reasonable counsel's decision to forego character testimony and psychiatric evaluation and to rely instead upon: (1) an earlier plea colloquy in which the defendant expressed remorse for his crime, told the sentencing judge that he had no significant prior criminal record, and explained that he was under extreme emotional and financial stress at the time of his crimes; (2) the fact that the judge stated at the plea colloquy that he respected people who were willing to admit responsibility for their acts; and (3) counsel's own oral argument which emphasized the defendant's remorse, his basically good character, his lack of a prior criminal history, and the fact that he was suffering an extreme mental and emotional disturbance at the time of the crimes. 466 U.S. at 672–74, 699, 104 S.Ct. at 2056–58, 2070.

Similarly, in *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), the Court held that counsel made a reasonable decision to forego presentation of mitigating evidence—after evaluating available testimony and determining that cross-examination would reveal matters prejudicial to the defendant—and to instead make a lesser culpability argument to the jury. There, defense counsel made a "considerable effort to gain mercy for [the defendant]," *id.* 107 S.Ct. at 3122 (quoting the district court) and n. 6, by forcefully arguing that the defendant was a 17 year old boy who merely did the bidding of an older accomplice who was the architect and leader of the crime.

In contrast, the closing argument in Kubat's case cannot, even charitably, be called a plea for mercy. The argument was, as the district court said, "a rambling, incoherent discourse ... that may actually have strengthened the jury's resolve to impose a death sentence." 679 F.Supp. at 812. In less than three pages of trial transcript, Kubat's counsel stumbled (or, perhaps, breezed) through references to the Old Testament, vengeance, "an eye for an eye," the New Testament, forgiveness, punishment, rehabilitation, deterrence, the boilermakers (beer and whiskey) that Kubat had consumed on the day of the murder, a hopeless sounding admission that counsel was "not going to convince" the jury, and then ended with a bizarre statement which asked the jury to "decide the way you feel, Robert Kubat or Lydia Hyde." As the district court said, "[i]t was utter lunacy for defense counsel to invite such a comparison" between Kubat and the victim. *Id.*

Given this grossly substandard argument and the fact that defense counsel presented no other evidence—despite the availability of fifteen character witnesses—Kubat's representation at sentencing amounted to no representation at all. No effort was made to present Kubat to the jury as a human being. Clearly, this total absence of advocacy falls outside *Strickland*'s "wide range of professionally competent assistance."

We wish to make clear our holding as to what constitutes competent assistance at a sentencing hearing under the Illinois death penalty statute. As stated above, we do not here decide whether the statute places an unconstitutional burden of production or persuasion on the defendant. However, we note that the Illinois Supreme Court has held that:

> Neither our death penalty statute nor the decisions of this court permit the automatic imposition of the death penalty ... where a capital defendant waives presentation of mitigating evidence. Suffice it to say that, while a defendant shall be sentenced to death if there are not mitigating factors sufficient to preclude imposition of the death penalty ..., mitigation may be found in the evidence adduced at trial as well as any evidence introduced at the sentencing hearing.

*People v. Johnson*, 114 Ill.2d 170, 102 Ill. Dec. 342, 358–59, 499 N.E.2d 1355, 1371–72 (1986), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1618, 94 L.Ed.2d 802 (1987). Viewing the performance of counsel solely from the perspective of strategic competence, we hold that defense counsel must make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors. Mitigating factors brought out at trial might be emphasized, a coherent plea for mercy might be given, or new evidence in mitigation might be presented. But counsel may not treat the sentencing phase as nothing more than a mere postscript to the trial. While the *Strickland* threshold of professional competence is admittedly low, the defendant's life hangs in the balance at a capital sentencing hearing. Indeed, in some cases, this may be the stage of the proceedings where counsel can do his or her client the most good.

Having found that the performance of Kubat's counsel at sentencing was deficient, we must now ask whether Kubat was prejudiced by counsel's errors—*i.e.*, whether there is a reasonable probability that, absent those errors, the result would have been different. In this regard, the *Strickland* Court stated:

> [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

466 U.S. at 696, 104 S.Ct. at 2069.

In Kubat's case, counsel, in effect, presented no defense at the sentencing hearing. We view this failure of counsel as "a breakdown in the adversarial process that our system counts on to produce just results." *Id.* On this basis alone, our confidence in the outcome is sufficiently undermined to find that Kubat was prejudiced. More specifically, however, we note that at least one of the fifteen available

character witnesses was a deputy sheriff. The introduction of testimony by a law enforcement officer that the defendant had a salvageable character might not have gone totally unnoticed by the jury. Indeed, (as will be explained more fully below) if just *one* juror had been sufficiently influenced by the character testimony, the death penalty could not have been imposed. Accordingly, we find that the probability that the outcome would have been different is sufficient to render counsel's assistance constitutionally ineffective.

### 2. *Failure to Object to Erroneous Instructions*

■ Under the Illinois death penalty statute, if any one juror believes that there are mitigating factors sufficient to preclude the death penalty, the sentence of death cannot be imposed. Ill.Rev.Stat. ch. 38, § 9-1(g). At Kubat's sentencing hearing, the following instructions and verdict forms were submitted to the jury without objection from defense counsel:

*People's Instruction No. 6*

If, after your deliberations, you unanimously determine that there is no sufficiently mitigating factor or factors to preclude the imposition of the death sentence on the defendant, you should sign the verdict form which so indicates. If you sign that verdict form, the Court must sentence the defendant to death.

If, after your deliberations, you *unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence, you should sign the form which so indicates. If you sign that verdict form, the Court will sentence the defendant to imprisonment.

. . . .

*People's Instruction No. 7*

. . . .

If after your deliberations one or more jurors conclude that the defendant should not be sentenced to death, all jurors shall sign the verdict reflecting the jury's inability to reach a unanimous verdict.

If after your deliberations you unanimously conclude that the defendant should be sentenced to death, all jurors shall sign the verdict reflecting the jury's unanimous conclusion that the court shall sentence the defendant to death.

You will be provided with (2) two forms of verdict. When you have *unanimously agreed* upon your verdict you will select the form which reflects your verdict and sign it as I have stated.

The forms of verdict which you will receive read as follows:

. . . .

We, the jury cannot unanimously conclude that the death penalty shall be imposed upon the defendant, ROBERT KUBAT. The Court shall sentence the defendant to imprisonment.

We, the jury unanimously conclude that the court shall sentence the defendant, ROBERT KUBAT, to death.

(emphasis added).

The state does not dispute that both the second paragraph of Instruction No. 6 and the third paragraph of Instruction No. 7 clearly misstate the law by calling for unanimous agreement on a decision not to impose the death penalty. The district court found that defense counsel's failure to object to these instructions constituted deficient performance. The state does not attempt to defend counsel's failure under the performance prong of *Strickland* and, thus, apparently accepts that the failure to object was professionally incompetent. We agree.

Rather, the state makes two arguments that focus on the prejudice component of *Strickland.* First, the state argues that

the Illinois Supreme Court's conclusion that Kubat was not prejudiced by counsel's error is a finding of fact entitled to a presumption of correctness under 28 U.S.C. § 2254(d). That argument is without merit. Accepting the argument would effectively foreclose all habeas review of sixth amendment ineffectiveness of counsel claims. Moreover, it is contrary to *Strickland*'s express holding that prejudice is a mixed question of law and fact and that "a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court." 466 U.S. at 698, 104 S.Ct. at 2070.[14]

Second, the state argues that the district court did not make a "considered determination" that Kubat was prejudiced by counsel's error. We disagree. The district court appropriately considered the combined effect of counsel's errors (failure to present mitigating evidence, the making of a prejudicial closing argument, and failure to object to erroneous instructions) and held that Kubat was prejudiced by those errors. *Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced. 466 U.S. at 694, 104 S.Ct. at 2068 ("but for counsel's unprofessional errors, the result of the proceeding would have been different").

In any event, however, the state's argument is beside the point. The issue is whether this court, on *de novo* review of a legal question, should find that Kubat was prejudiced. Because we have already found that the failure to present a coherent defense at sentencing was constitutionally defective, we will focus solely on the effect of counsel's failure to object to the instruc-

**14.** The state attempts to characterize the Illinois Supreme Court's belief that the jury was not confused as an underlying factual finding as to state of mind which supported the ultimate conclusion that no prejudice resulted. The state relies on cases which hold that a state court determination of whether prospective jurors were biased is a finding of fact, *Wainwright v. Witt,* 469 U.S. 412, 426–29, 105 S.Ct. 844, 853–55, 83 L.Ed.2d 841 (1985); *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984), and a case from this circuit holding that a state court determination that a defendant knowingly waived his or her *Miranda* rights is a

finding of fact, *Perri v. Director, Department of Corrections,* 817 F.2d 448 (7th Cir.1987). Those cases do not support the state's argument, for in each case the state court was called upon to assess the credibility of certain testimony—voir dire testimony in *Wainwright* and *Patton,* and testimony as to the circumstances of the alleged waiver in *Perri.* Here, the state court was not faced with a question which required it to assess credibility or weigh evidence to determine a particular person's state of mind. Rather, the court's task was to make an objective legal inquiry as to the reasonable probability that the outcome would have been different.

tions. The test is whether the probability that the outcome would have been different, absent counsel's error, is sufficient to undermine our confidence in the result. We find the probability to be sufficient.

The state points out that the instructions were not wholly erroneous but only conflicting, in that the first paragraph of Instruction No. 7 correctly states the law and that the verdict forms were correct. We note that the first paragraph of Instruction No. 7 does not, in fact, state any law. Unlike the surrounding paragraphs, that paragraph does not state what sentence will be imposed should the jury fail to reach unanimous agreement. Moreover, the paragraph is worded in the negative—referring to "the jury's *inability* to reach a unanimous verdict"—and could be taken as another indication that the jury's goal was to reach unanimous agreement. We do agree that the verdict forms were technically correct—although we note that there, too, the first verdict form was phrased in terms of ability rather than decision. That is, the form states "the jury *cannot* unanimously conclude," rather than stating "the jury *does not* unanimously conclude." In sum, the instructions were in part inaccurate and in part conflicting.

Whether the jury was completely misled or merely confused would not alter our determination that Kubat was prejudiced. At worst, the jury may have retired for deliberations believing it had to reach a unanimous verdict on sentencing just as it had to do on the merits. At best, it may have entered the jury room confused. Indeed, even if only one juror had been confused, the reliability of the verdict is undermined. For if that one juror thought that the death penalty should not be imposed, he or she might have submitted to the views of the other eleven because of the mistaken belief that unanimity was required. As the district court aptly stated, "[d]ue to his misunderstanding of the law, this juror would have resigned himself to acquiescence in Kubat's death sentence, unaware that his solitary dissenting vote

would have prevented imposition of the death penalty." 679 F.Supp. at 815. Given this scenario, our confidence in the outcome is sufficiently undermined to find that Kubat was prejudiced.[15]

Accordingly, we hold that: (1) the failure to present a coherent defense at sentencing rendered counsel's assistance constitutionally ineffective; and (2) the failure to object to erroneous instructions at sentencing rendered counsel's assistance constitutionally ineffective.

### B.

### Erroneous Jury Instructions

As an alternative basis for vacating Kubat's death sentence, the district court held that the erroneous instructions, standing alone, required reversal. Kubat had argued in his brief to the district court that the erroneous instructions violated due process, equal protection, and the eighth amendment. The district court did not refer to these constitutional provisions in its opinion. Rather, the district court reasoned that the trial judge had committed plain error when he instructed the jury that unanimity was required to preclude imposition of the death penalty, and that, applying the harmless constitutional error standard announced in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the error was not harmless beyond a reasonable doubt. Although we agree with the district court's conclusion that the erroneous instructions require reversal, we find that the district court's use of both the plain error doctrine and the *Chapman* standard was inappropriate. Before turning to the merits of Kubat's claim, we wish to clarify the application of this standard.

First, the plain error doctrine allows an appellate court, on direct review, to reverse a judgment of conviction or sentence to prevent a "miscarriage of jus-

---

15. The state also points out that the jury reached its verdict in only 63 minutes, and that polling of the jury revealed no doubts or hesi-

tation. Neither the length of time for deliberation nor the standard polling of the jury lessens our belief that the verdict is not reliable.

tice," [16] even though the defendant did not object to the error at trial. Most jurisdictions recognize the doctrine, *see* W. LaFave and J. Israel, 3 *Criminal Procedure* § 26.5(d), at 255 (1984) [hereinafter LaFave & Israel], including the federal courts, see Fed.R.Crim.P. 52. The doctrine is not applicable, however, in a proceeding on a writ of habeas corpus from a state court. *Engle v. Isaac*, 456 U.S. 107, 134–35, 102 S.Ct. 1558, 1575–76, 71 L.Ed.2d 783 (1982); *United States v. Frady*, 456 U.S. 152, 162–66, 102 S.Ct. 1584, 1591–95, 71 L.Ed.2d 816 (1982); *see also* LaFave & Israel, § 27.4, at 343–44. Rather, when a defendant fails to make an objection at trial in state court, the state appellate court will apply its procedural rules—which will usually include a plain error rule—and decide whether to reach the merits of the defendant's claim. Generally, if the state court finds that the claim is procedurally defaulted, habeas review of the claim by a federal court will be foreclosed unless the defendant can meet the cause and prejudice test of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). *See generally* LaFave & Israel, § 27.4. In the instant case, the Illinois Supreme Court addressed the merits of Kubat's claim that the erroneous instructions required reversal. Thus, we are free to review the merits.

■ Second, when a court, on direct appellate review, finds that an error rises to the level of plain error, reversal is automatic. *See United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed. 2d 1 (1985); C. Wright, 3A *Federal Practice and Procedure* §§ 851, 856 at n. 26 (2d ed. 1982 & Supp.1988). Thus, the *Chapman* harmless error standard is inapplicable.

Turning to the merits, we find that the Supreme Court's recent decision in *Mills v.*

*Maryland,* —— U.S. ——, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), is dispositive of Kubat's eighth amendment claim.[17] In *Mills,* the Supreme Court vacated the petitioner's death sentence which had been imposed by a jury under circumstances similar to the instant case. To understand the holding in *Mills,* we must first describe the procedure and instructions under which the petitioner was sentenced. The Maryland death penalty statute divides the sentencing hearing into three stages (in contrast to Illinois' two stages). During the first stage, the jury was required to determine whether a statutory aggravating factor existed which made the petitioner eligible for the death penalty. During the second stage the jury was required to determine whether any mitigating factors existed. If the jury found that mitigating factors existed (which it did not find), it would have proceeded to the third stage which required balancing of the aggravating factors against the mitigating factors. Stage two was the stage at issue in *Mills.*

The trial judge in *Mills* had repeatedly instructed the jury that all of its decisions were to be unanimous. At stage two, the jury was required to fill out a verdict form which listed each mitigating factor and asked the jury to mark "yes" or "no" as to the existence of each factor. The jury marked each answer "no." The petitioner argued that, based on the verbal and written instructions which had stressed unanimity:[18] (1) the jury understood that unanimous agreement was required to mark "yes"; (2) since "no" is the opposite of "yes," reasonable jurors might have thought that a failure to reach a unanimous "yes" required them to mark the answer "no"; and therefore (3) some of the jurors might have found the existence of mitigating factors despite the fact that the

---

16. Plain error is not easily defined. Many courts have used the phrase "miscarriage of justice" to describe the standard for plain error. *See* W. LaFave and J. Israel, 3 *Criminal Procedure* § 26.5, at 255–56 and 256 n. 31; *see also United States v. Kerley*, 838 F.2d 932, 937 (7th Cir.1988) ("a plain error is ... one whose correction is necessary to prevent a "miscarriage of justice").

17. Because we find, under *Mills,* that the erroneous jury instructions violated the eighth amendment, we do not address Kubat's claims of violations of due process and equal protection.

18. The verdict forms and instructions were quite lengthy and we will not set them out here. We refer the reader to the published opinion. *See* 108 S.Ct. at 1870–72, 1873–74.

jury had marked all answers "no." In response, the state argued that the instructions, which emphasized the need for unanimity on all questions, would have led the jury to believe that unanimity was required for a "no" answer as well as a "yes" answer.

In analyzing the petitioner's claim, the *Mills* Court began by stating:

> It is beyond dispute that in a capital case "the sentencer [may] not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." The corollary that "the sentencer may not refuse to consider *or be precluded from considering* "any relevant mitigating evidence" is equally "well established."

108 S.Ct. at 1865 (citations omitted) (emphasis in original).

The Court then stated the "critical question" as whether a reasonable jury could have understood the instructions according to petitioner's interpretation. *Id.* at 1866. The Court stressed that "[i]n reviewing death sentences [as opposed to reviewing findings of guilt], the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds." *Id.* The Court continued, saying " '[t]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty ... is unacceptable and incompatible with the commands of the

Eighth and Fourteenth Amendments.' " *Id.* (quoting *Andres v. United States,* 333 U.S. 740, 752, 68 S.Ct. 880, 886, 92 L.Ed. 1055 (1948)). The Court then stated, "[u]nless we can rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground, we must remand for resentencing." The Court concluded that:

> We cannot say with any degree of confidence which interpretation Mills' jury adopted. But common sense and what little extrinsic evidence we possess suggest that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation ..., unless they are expressly instructed to do so.

108 S.Ct. at 1870. Accordingly, the Court vacated Mills' sentence on the ground that one or more of the jurors might have been precluded from considering mitigating factors.

■ The same analysis applies in Kubat's case. Kubat's jurors were never expressly informed in plain and simple language that if even one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death. On the contrary, the instructions emphasized unanimity. As discussed in part III, A., 2., above, there is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.[19]

---

**19.** We note again that mitigating factors are not necessarily limited to those adduced from specific evidence offered at the sentencing hearing (such as character testimony). A juror might be disposed to grant mercy based on other factors, such as a humane perception of the defendant developed during trial. This is not to say that a juror may base a sentencing decision on *"mere sympathy"* rather than record evidence. *See California v. Brown,* 479 U.S. 538, 542–43, 107 S.Ct. 837, 840, 93 L.Ed.2d 934 (1987) (emphasis in original). But each juror must be permitted to consider, as a mitigating factor, "any aspect of a defendant's character and record and any of the circumstances of the offense." *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978)).

We note also that in reviewing sentencing instructions the question is " '"what a reasonable juror could have understood the charge as meaning.'" *California v. Brown,* 479 U.S. at 541, 107 S.Ct. at 839 (quoting *Francis v. Franklin,* 471 U.S. 307, 315–16, 105 S.Ct. 1965, 1971–72, 85 L.Ed.2d 344 (1985)). Where, as here, two of the instructions failed constitutional muster by calling for unanimous agreement as to the sufficiency of mitigating factors, the question becomes whether the instructions as a whole "delivered a correct interpretation of the law." *California v. Brown,* 479 U.S. at 541, 107 S.Ct. at 839. We find that under the conflicting instructions in this case, a reasonable juror might well have believed that unless all jurors were disposed to grant mercy Kubat would be sentenced to death. While it is possible that the jurors could have relied on the one correct verdict

Accordingly, we hold that the erroneous instructions violated the eighth and fourteenth amendments and, on this basis alone, Kubat's sentence cannot stand.

### IV.

For the reasons stated in this opinion, the judgment of the district court is AFFIRMED.

form, and disregarded the two incorrect instructions, it is equally likely that the jurors relied on the two incorrect instructions and disregarded the one correct verdict form.